STATE of Wisconsin, Plaintiff-Respondent,

v.

Michael Anthony LOCK, Defendant-Appellant.†

Court of Appeals

*No. 2011AP699–CR. Submitted on briefs May 8, 2012.
—Decided August 7, 2012.*

2012 WI App 99

(Also reported in 823 N.W.2d 378.)

† Petition for Review denied 12-10-12.

166

170

171

172

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jerome F. Buting* of *Buting & Williams, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *James M. Freimuth*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. BRENNAN, J. Michael Anthony Lock appeals from judgments entered after a jury found him guilty of two counts of first-degree intentional homicide, kidnapping while armed, and possession with intent to deliver more than forty grams of cocaine, all as party to a crime, and from an order denying his postconviction motion. Lock generally complains that the trial court improperly admitted other-acts evidence at trial and that the State violated its discovery obligations. We conclude, for reasons set forth in more detail below, that no improper other-acts evidence was admitted, or that if it was, the evidence otherwise amassed against Lock was so great that the admission of any such improper evidence was harmless. Furthermore, we conclude that the postconviction court did not erroneously find that the State disclosed all necessary information to the defense, and that if the State did violate its discovery obligations, its omissions were harmless. As such, we affirm.

## BACKGROUND

### The Complaints

¶ 2. In July 2007, the State filed a criminal complaint, charging Lock with one count of kidnapping

while armed, one count of possession of cocaine with intent to deliver more than forty grams of cocaine, and one count of racketeering activity, all as party to a crime. The complaint alleged that in May 2002 Lock and several co-defendants kidnapped, tortured, and robbed Leoporium Ford during a cocaine deal. The racketeering charge against Lock stemmed from a belief, based on the alleged crimes contained in the criminal complaint, that between January 2002 and July 2007 Lock engaged in multiple acts of distribution of controlled substances, kidnapping, and armed robbery.

¶ 3. In October 2007, the State filed a second criminal complaint against Lock and a co-defendant, charging him with two counts of first-degree intentional homicide for the August 1999 death of Felipe Armondo Melendez-Rivas and the April 2000 death of Eugene Chaney.

*Pretrial Motions*

¶ 4. In December 2007, prior to trial, Lock moved the trial court to exclude from admission at trial any evidence of other crimes and acts unrelated to the charges. The State responded that it did "not intend to use other acts evidence except as they pertain to the specific crimes in which the defendant is charged. There is no intention to introduce evidence of fraud, theft, or distribution of [a] controlled substance except as they pertain to the charges that are before the court for trial." Apparently concluding that the State's response rendered Lock's motion moot, the trial court did not rule upon the motion and defense counsel did not press the trial court for a ruling on the matter.

¶ 5. Also in December 2007, the State moved for the two cases against Lock to be consolidated for trial.

175

In a hearing on the motion, Lock objected to the State's request for consolidation on grounds that the racketeering charge would present prejudicial and irrelevant evidence with respect to the two first-degree intentional homicide charges. The State agreed to drop the racketeering charge upon consolidation of the cases, and the trial court granted the State's request to consolidate.

## Trial

¶ 6. The case against Lock proceeded to trial in July 2008. The amended information contained five charges against Lock, including two counts of first-degree intentional homicide (one each for the deaths of Melendez-Rivas and Chaney), one count of kidnapping, one count of possession with intent to deliver more than forty grams of cocaine, and one count of aggravated battery, all as party to a crime. Prior to trial, the State agreed to drop the aggravated battery charge against Lock, and proceeded only on counts one through four. The following evidence was elicited at trial.

## The Ford Kidnapping

¶ 7. Ford,[1] an admitted drug dealer, testified at trial that on May 11, 2002, Lock kidnapped him and robbed him of a half kilogram (approximately eighteen ounces) of cocaine. Ford testified that his associate,

---

[1] Ford told the jury that in exchange for his truthful testimony against Lock the State had agreed not to prosecute him for anything he said on the stand. Ford also testified that he had a "cooperation" agreement with federal authorities and expected to be sentenced to less than ten years on his pending federal charges.

176

Antwon Sanders,[2] acting as the middleman, set up a meeting between Ford and Ed Hankins, Jr., Lock's brother-in-law. At the meeting, Ford arranged to sell Hankins, Jr., a half kilogram of cocaine.

¶ 8. Sanders corroborated much of Ford's testimony, testifying that Hankins, Jr., approached him looking for cocaine for "him and his guy." Sanders stated that Hankins, Jr., introduced Sanders to Lock, who agreed to buy a half kilogram of cocaine from Ford for $13,000.

¶ 9. Hankins, Jr.,[3] testified that Lock asked him for help robbing Ford, because Lock believed Ford "was a big-time drug dealer." Hankins, Jr., agreed to help and testified that he approached Sanders, who he believed was selling cocaine for Ford, to set up a deal. Hankins, Jr., stated that Sanders was aware of the plan to rob Ford.

¶ 10. Ford testified that on the day of the robbery he met up with his cousin, Desha Cox,[4] who had come to repay Ford $3000 he was owed and who accompanied him to a residence at 4720 North 53rd Street ("the 53rd Street house") to complete the drug transaction with

[2] The parties' briefs do not address and our review of Sanders's testimony did not reveal whether Sanders received any consideration from the State in exchange for his testimony.

[3] In exchange for Hankins, Jr.'s truthful testimony against Lock, the State dismissed several unrelated cases against Hankins, Jr. Hankins, Jr., agreed to plead guilty to substantial battery and possession with intent to deliver cocaine for the crimes against Ford, and to plead guilty to a drug count in another case. The State agreed to recommend eight years of initial confinement.

[4] The parties' briefs did not address and our review of Cox's testimony did not reveal whether Cox received any consideration from the State in exchange for his testimony.

Lock. Sanders was supposed to meet Ford at the house, but never arrived. Ford and Cox both testified that when they arrived at the 53rd Street house, Hankins, Jr., pulled a TEC-9 machine gun on them, while several other men grabbed them, bound their arms and legs with wire hangers, and duct taped their eyes and mouths. Ford said that the men took the cocaine he had brought to sell to Lock.

¶ 11. Hankins, Jr., testified that Lock, Donald Cooper, and Carl Davis (Lock's uncle) were all part of the group of men who ambushed Ford and Cox and that Lock had a .40–caliber automatic handgun. Hankins, Jr., told the jury that Lock and Cooper "slammed" Ford down, "taped him up," and "savagely" beat Ford, while Ford pleaded for his life. Hankins, Jr., further testified that, acting on Lock's orders, he demanded more drugs from Ford. Hankins, Jr., said that Lock instructed him "to threaten [Ford] and let him know that we [are] the Body Snatchers . . . we rob people and . . . if they don't comply, they come up missing."

¶ 12. Ford testified that he heard "grease popping," after which his pants and shirt were torn, and hot grease was poured on his skin. Photographs showed burn scars on Ford's legs. Ford stated that he also suffered "two slipped dis[c]s" in his back, bruised ribs, and a swollen face from the beating. Ford also testified that he recognized Lock's voice during the robbery, having previously gambled with Lock and having seen Lock when an acquaintance of Ford's was hired to do "lead abatement" work on property Ford believed Lock owned.

¶ 13. Cox testified that, at some point during the robbery, he was taken downstairs, and the tape over his eyes was removed, enabling him to recognize Lock and Cooper. Cox said he was overjoyed to see Cooper, a

178

longtime friend, and that he offered to get Cooper the $3000 that he had given to Ford earlier that day. Davis and Cox testified that Lock accompanied Cox to get the money. Cox testified that when he and Lock returned to the 53rd Street house, he and Ford were released.

¶ 14. Milwaukee Police Detective David Baker testified that nine days after the kidnapping, he arrested Lock and Davis after a controlled drug buy and found two bags of cocaine, totaling about nine ounces or a quarter kilogram (approximately one-half of the amount stolen from Ford), in Davis's jacket. Later that day, police executed a search warrant at Lock's 53rd Street house and found a .9mm pistol, plastic bags, scales, and documents in Lock's name and his wife's name.

### The Melendez-Rivas Homicide

¶ 15. Frisco Richardson (Lock's cousin) testified at trial that he worked for Lock doing home-improvement work. He stated that in August 1999, he was among several people in the backyard of a home he believed was owned by Lock at 4900 West Fiebrantz Street ("the Fiebrantz house") when Lock asked him to help Davis dig a hole. Richardson further stated that Lock offered him $200 for his work, but that instead, Richardson accepted a van. Richardson said that he was told that the hole "was for a concrete slab to put two doghouses on," but that the hole was deeper than needed for that purpose.

¶ 16. Davis[5] testified that Lock asked him and Richardson to dig the hole six feet deep. He said Lock

---

[5] In exchange for his truthful testimony against Lock, the State agreed not to charge Davis with robbery or homicide for his role in the Ford kidnapping or the deaths of Melendez-Rivas and Chaney.

179

expected "to get a big payday" and that Lock controlled both the 53rd Street and Fiebrantz houses in 1999 and 2000.

¶ 17. Juan Terrazas testified at trial that he was Melendez-Rivas's roommate in August 1999, and that on August 10, 1999, Melendez-Rivas left their home in Illinois with Terrazas's car, which contained Terrazas's cell phone. Melendez-Rivas never returned.

¶ 18. Benny Kern[6] testified that in 1999 he acted as a "middleman to a lot of [drug] deals" between Melendez-Rivas and Lock. Kern said Melendez-Rivas would seek to distribute kilograms of cocaine and that Lock would find buyers.

¶ 19. At trial, Davis described the last such meeting between Melendez-Rivas and Lock. Davis testified that he and Lock met Melendez-Rivas at a restaurant off of the interstate. Davis said Melendez-Rivas was dropped off in a vehicle from which Melendez-Rivas retrieved a white box, purportedly containing twenty kilograms of cocaine. Davis said Melendez-Rivas wanted to party and accompanied him and Lock back to Milwaukee. According to Davis, Lock dropped Davis off at his home and said he would call Davis if he needed help in "get[ting] rid of Melendez[-Rivas]." Davis said he knew that Lock planned to have Melendez-Rivas killed.

¶ 20. Davis testified that he stopped at the Fiebrantz house later that day, smelled a bad odor, and called Lock, who told Davis to leave. Davis said he returned to the Fiebrantz house the next day at Lock's request. According to Davis, Lock said he had left Melendez-Rivas with Cooper and that when Lock re-

---

[6] The parties' briefs do not address and our review of Kern's testimony did not reveal whether Kern received any consideration from the State in exchange for his testimony.

turned Melendez-Rivas was dead. Davis said that at Lock's direction, he helped carry Melendez-Rivas's body, wrapped in plastic, to the hole in the backyard, where they covered Melendez-Rivas with dirt. Davis said Melendez-Rivas appeared to have "been duct taped in the back" and that, at Lock's direction, he covered the grave with a cement slab.

¶ 21. Stacie Happel, a business associate of Lock's, who put mortgages for Lock in her name, testified that she purchased the Fiebrantz house from Lock in June 2005. Happel stated that one of two cement slabs in the backyard was cracked, so on August 8, 2005, some friends removed the slab, uncovering a body wrapped in a tarp. Happel said she told the neighboring fire department, who informed police. She said she also informed Lock the same day. According to Happel, Lock "said he didn't know anything about it and he told me that I didn't know anything about it and not to say anything." Happel said that Lock did not respond when she told him she had called the police.

¶ 22. Milwaukee Police Detective Carl Buschmann testified that the body, mostly bones, was in a fetal position, wrapped in plastic and a comforter, and covered by a tarp. The eyes, mouth, chest, and legs were duct taped, the arms were tied behind the back, the ankles were bound with rope, and the shoulders were secured with a leather belt. Female underpants had been put around the knees. The pathologist attributed the death to "homicidal injuries." DNA analysis identified the victim as Melendez-Rivas.

### The Chaney Homicide

¶ 23. Davis testified that sometime after August 1999 Lock asked him to dig another hole in the backyard of the Fiebrantz house. Davis said he did so with

the help of Albert Dotson. Davis said that Lock told him that he planned to rob and kill a drug dealer named Eugene Chaney and bury his body in the hole.

¶ 24. Floragina Chaney, Chaney's sister, testified that Chaney was a drug dealer. She said that in the early evening of April 7, 2000, Chaney left home with a duffel bag, planning to meet Lock and to return in thirty minutes. She stated that Chaney was wearing the work shirt of his flower-shop employer, with his name on the shirt. Floragina never saw Chaney again.

¶ 25. Altonio George, who was engaged to another one of Chaney's sisters, also testified at trial that Chaney was a drug dealer. According to George, on April 7, 2000, Chaney told him that Lock called to say "he got something for us." George said that Chaney then counted out more than $100,000, and drove off without George. George never saw Chaney again.

¶ 26. The testimony at trial revealed that at the time of his disappearance in April 2000, Chaney drove a 1997 Cadillac and used a cell phone registered to his daughter. Phone records show that the last phone call made from that cell phone on April 7, 2000, was placed to Lock's phone number at 5:57 p.m.

¶ 27. Louis Jackson[7] testified at trial that he belonged to an organization, headed by Lock, that robbed drug dealers and regularly sold kilograms of cocaine. He said that in April 2000, Lock told him to follow Chaney, whom Lock believed was "rich," so that they could plan to rob him. Jackson said that after he finished his surveillance he told Lock that Chaney was "working either with the police or the FBI." Jackson

[7] As we set forth in more detail later, Jackson testified that he was a low-level player in Lock's criminal organization and received "use immunity" for his truthful testimony.

182

said that he later followed Chaney to the Fiebrantz house and "got paid two days later."

¶ 28. Rodney Lee[8] testified that he did home-improvement work for Lock and that in 2000, Davis enlisted him to "do a favor" for Lock. Lee said that Davis picked him up early one evening and drove him to the 53rd Street house. According to Lee, Lock was at the 53rd Street house and Lock told him that a drug dealer was coming over and that he wanted Lee and Cooper to hide in another room. According to Lee, Lock said to call each other "auntie" rather than use their real names.

¶ 29. Lee stated that after Chaney arrived, Lock and Cooper pulled out guns and made Chaney lie down. Lee said that at Lock's direction, he handcuffed Chaney's hands behind his back and duct taped Chaney's mouth shut. Lee said Lock gave him Chaney's car keys and a pair of gloves to wear to avoid finger-prints, then told him to follow Davis and drop off Chaney's car. Lee said he left Chaney's car somewhere off of Hampton Avenue near Highway 100 and drove back to the 53rd Street house with Davis. Lee said Lock gave him $1900 and told Davis to take Lee home. Police testimony revealed Chaney's car was discovered in a parking lot near Highway 100 six weeks later.

¶ 30. Davis testified that after he brought Lee to the 53rd Street house he acted as a lookout after Chaney entered. Davis said that when Lock called him inside, Chaney was lying restrained on the kitchen

[8] Pursuant to a plea agreement, the State allowed Lee to plead guilty to one count of robbery for his role in Chaney's death and agreed to make no recommendation at sentencing, in exchange for Lee's truthful testimony against Lock.

floor. Davis said Lock directed him and Lee to "ditch" Chaney's car. Davis said Lock reported that Chaney had brought along $100,000.

¶ 31. Davis further testified that when he returned to the 53rd Street house after dropping Lee off, he backed up his Suburban to the rear of the house, on Lock's instructions. Davis said Lock and Cooper then put Chaney in the back of the vehicle. Davis said he and Cooper drove Chaney to the Fiebrantz house, while Lock followed.

¶ 32. Davis testified that once at the Fiebrantz house, he drove into the garage at Lock's direction. Davis said Cooper told him to exit the garage and close the door. As Davis was leaving, he saw Cooper place a "white, plastic bag" over Chaney's head, and that when Davis heard Chaney gasping, Lock told Davis to "chill out." Davis said that when the garage door was raised, he saw Cooper throw Chaney's motionless body into the empty hole in the backyard. Davis said Lock told him to come back later and put a cement slab over the hole, and he did. He said Lock gave him $2000 for his efforts.

¶ 33. Milwaukee Police Detective Cameo Barbian-Gayan testified that on August 9, 2005, Happel, who had discovered Melendez-Rivas's body in the backyard of the Fiebrantz house, permitted police to remove the second cement slab. Beneath the second cement slab, police found a decomposing body lying face down in the dirt. Through dental records and clothing—including the "Eugene" name tag and flower-shop initials on the shirt—the body was identified as Chaney's. The pathologist attributed death to "homicidal violence."

*Verdict and Sentencing*

¶ 34. Following closing statements, the jury found Lock guilty on all four counts: two counts of first-

184

degree homicide, one count of kidnapping, and one count of possession with intent to deliver more than forty grams of cocaine, all as party to a crime. Lock was sentenced to two consecutive life terms for the homicides of Melendez-Rivas and Chaney. As to the kidnapping charge, he was sentenced to a fifteen-year bifurcated sentence, to be served consecutive to a seventeen-year bifurcated sentence for the drug charge.

## Postconviction Motion

¶ 35. Lock filed a postconviction motion for a new trial, arguing that: (1) Lock's right to a fair trial was denied by the State's use of extensive prior uncharged criminal conduct against him; (2) the State violated its *Brady v. Maryland*, 373 U.S. 83 (1963), and discovery obligations; (3) Lock's trial counsel provided ineffective assistance by failing to fully challenge improper evidence; and (4) he is entitled to a new trial on the grounds of newly discovered evidence.[9] The postconviction court adopted the State's proposed findings of fact and conclusions of law and denied Lock's motion for postconviction relief. Lock appeals.

¶ 36. Additional facts are included in the discussion section as necessary.

## DISCUSSION

¶ 37. Lock raises a number of issues on appeal: (1) whether the admission of improper other-acts evidence denied Lock his due process right to a fair

---

[9] Lock has not raised the newly-discovered-evidence argument on appeal, and acknowledges in his appellant's brief that he has abandoned that issue. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998).

trial; (2) whether the State violated its discovery obligations under *Brady*; (3) whether the State violated Lock's right to reciprocal discovery pursuant to Wis. Stat. § 971.23 (2009–10)[10]; and (4) whether this court should order a new trial in the interest of justice. We address each issue in turn.

## I. The State did not introduce improper other-acts evidence or if it did the error was harmless.

¶ 38. Lock argues that the trial court permitted into evidence "[a]n abundance of uncharged 'other acts' evidence," which allowed the State to portray Lock as the head of "a vast criminal enterprise that engaged in countless uncharged crimes, including unspecified numbers of murders, drug dealing, robberies, mortgage and bank fraud and prostitution." Lock contends that the alleged other-acts evidence so infected the trial with unfairness as to make the resulting conviction a denial of due process. In conjunction with his other-acts argument, Lock complains that to the extent his trial counsel failed to obtain a pretrial ruling prohibiting the admission of the other-acts evidence, or otherwise failed to object to each piece of other-acts evidence during the trial, his trial counsel rendered ineffective assistance. He also complains that the State improperly relied on the unduly prejudicial other-acts evidence during an "inflammatory" closing statement. We disagree.

¶ 39. Wisconsin Stat. § 904.04(2)(a) prohibits the admission of "evidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to

---

[10] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

show that the person acted in conformity therewith." However, the statute permits the admission of other-acts evidence to prove motive, opportunity, intent, preparation or plan, knowledge, identity, absence of mistake or accident, and context or background. Wis JI—Criminal 275.

¶ 40. When deciding whether to allow other-acts evidence, Wisconsin courts look to Wis. Stat. § 904.04(2)(a), and apply the three-step analytical framework set forth in *State v. Sullivan*, 216 Wis. 2d 768, 772–73, 576 N.W.2d 30 (1998). *State v. Marinez*, 2011 WI 12, ¶ 19, 331 Wis. 2d 568, 797 N.W.2d 399. Under *Sullivan*, courts must consider: (1) whether the evidence is offered for a proper purpose under § 904.04(2); (2) whether the evidence is relevant; and (3) whether the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury." *Sullivan*, 216 Wis. 2d at 772–73.

¶ 41. The proponent of the other-acts evidence "bears the burden of establishing that the first two prongs are met by a preponderance of the evidence." *Marinez*, 331 Wis. 2d 568, ¶ 19. Once the first two prongs of the test are satisfied, the burden shifts to the opposing party "to show that the probative value of the [other-acts] evidence is substantially outweighed by the risk or danger of unfair prejudice." *Id.*

¶ 42. However, even if other-acts evidence is erroneously admitted, reversal of the jury's decision is not automatic. "Error in admitting other acts evidence is subject to harmless error analysis." *State v. Thoms*, 228

187

Wis. 2d 868, 873, 599 N.W.2d 84 (Ct. App. 1999). The test for harmless error is whether there is a reasonable possibility that the error contributed to the conviction. *State v. Anderson*, 2006 WI 77, ¶ 114, 291 Wis. 2d 673, 717 N.W.2d 74.

¶ 43. The admissibility of evidence rests within the trial court's discretion and the decision to admit other-acts evidence is reviewed for an erroneous exercise of discretion. *Sullivan*, 216 Wis. 2d at 780. "A [trial] court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and uses a demonstrably rational process to reach a conclusion that a reasonable judge could reach." *American Family Mut. Ins. Co. v. Golke*, 2009 WI 81, ¶ 43, 319 Wis. 2d 397, 768 N.W.2d 729. We generally look for reasons to sustain the trial court's discretionary decisions. *Loomans v. Milwaukee Mut. Ins. Co.*, 38 Wis. 2d 656, 662, 158 N.W.2d 318 (1968). "Although the proper exercise of discretion contemplates that the [trial] court explain its reasoning, when the court does not do so, we may search the record to determine if it supports the court's discretionary decision." *Randall v. Randall*, 2000 WI App 98, ¶ 7, 235 Wis. 2d 1, 612 N.W.2d 737. We are required to independently review the record if the trial court does not provide a detailed *Sullivan* analysis. *State v. Hunt*, 2003 WI 81, ¶ 4, 263 Wis. 2d 1, 666 N.W.2d 771. As such, because the trial court did not perform a *Sullivan* analysis in this case, our review is *de novo. See id.*

¶ 44. Lock's other-acts argument is three-fold. First, Lock individually addresses the testimony of ten witnesses whom he alleges, in one form or another, each testified to impermissible other-acts evidence. Second, he argues that his trial counsel was ineffective for

failing to obtain a pretrial ruling on the admissibility of the other-acts evidence or otherwise object to each piece of other-acts evidence at trial. Third, Lock contends that the State improperly relied upon the inadmissible other-acts evidence in its closing argument. Because we conclude that no other-acts evidence was impermissibly admitted at the trial, or if such evidence was admitted, its admission was harmless, we need not address whether the State improperly relied on such evidence during its closing argument. We address Lock's other concerns in turn.

A. *The Evidence.*

¶ 45. Lock dedicates nineteen pages of his appellate brief to painstakingly walking through the trial testimony of ten witnesses, each of whom he argues testified to improper other-acts evidence. We address each witness's testimony individually, as does Lock. However, unlike Lock, we conclude that no improper evidence was admitted.[11]

### Benny Kern

¶ 46. Lock first addresses the testimony of Benny Kern. To review, Kern testified that in 1999 he was friends with both Melendez-Rivas (the victim killed in 1999) and Lock, and that he introduced the two to each other. Kern also testified that he, on occasion, acted as a middleman between Lock and Melendez-Rivas, assisting them in cocaine deals.

---

[11] We need not address the State's argument that the bulk of the challenged evidence does not require an other-acts analysis because it is admissible as part of the *res gestae* of the crimes charged or Lock's argument that the evidence was not admissible for purposes of "context," because we conclude that the evidence is otherwise admissible for the reasons we set forth hereafter.

189

¶ 47. Lock takes issue with Kern's testimony that Lock was "involved in the drug trade" and that there were "a lot of deals" between Melendez-Rivas and Lock. While Lock admits that the testimony about a drug deal between Lock and Melendez-Rivas on the day Melendez-Rivas was killed passes the first two prongs of the *Sullivan* test—admission for a permissible purpose under Wis. Stat. § 904.04(2) and relevance—he argues that Kern's testimony describing Lock as a "large drug dealer" and "in the trade" is not probative of whether Lock killed Melendez-Rivas and is unduly prejudicial. He argues that the State should have been limited to introducing evidence only of the singular drug transaction that occurred the day that Melendez-Rivas was killed. We disagree.

¶ 48. Kern's testimony that Lock was a "large drug dealer" and "involved in the drug trade" was not new evidence to the jury. The basis for each of the charges against Lock was drug related and many witnesses, including Lock, testified that he sold drugs: Davis testified that Melendez-Rivas was meeting Lock so that Lock could purchase twenty kilograms of cocaine; several witnesses, including George and Davis, testified that Chaney brought $100,000 to the 53rd Street house for Lock as part of a drug deal; and Sanders testified that as part of the Ford set-up, Lock agreed to purchase a half kilogram of cocaine from Ford for $13,000. Lock does not challenge that testimony. As such, Kern's testimony that Lock was a "large drug dealer" and "involved with the drug trade," while probative of the ongoing relationship between Lock and Melendez-Rivas, was not unduly prejudicial because it merely duplicated testimony already known to the jury. *See Marinez*, 331 Wis. 2d 568, ¶ 19 (opposing party must demonstrate "that the proba-

tive value of the [other-acts] evidence is substantially outweighed by the risk or danger of unfair prejudice").

*Officer Dean Newport*

¶ 49. During direct examination, Milwaukee Police Officer Dean Newport sought to tie Lock to the two residences where the crimes occurred—the 53rd Street and Fiebrantz houses—using utility bills, cable bills, and vehicles, including a white 1999 Cadillac Escalade and a gray 2000 Jaguar that Lock was known to drive. On cross-examination of Officer Newport, Lock attempted to distance himself from such links by presenting evidence that he owned many properties in addition to the ones at issue and that the Escalade was registered to his former wife.

¶ 50. On redirect, Officer Newport identified a photograph—taken between 2000 and 2002 and found during the May 2002 execution of a search warrant at the 53rd Street house—depicting Lock crouched in front of the garage at the 53rd Street house, flanked by a black Cadillac and the white Escalade and gray Jaguar that Officer Newport had previously observed parked at the Fiebrantz house. In the photo, Lock is holding a basketball in one hand and dollar bills in the other. During cross-examination, defense counsel asked Officer Newport, "What's the purpose of the picture?" Officer Newport replied that the photograph likely was meant to convey that Lock "ha[d] the world in [his] hands." On redirect examination, Officer Newport said his explanation was based on debriefing drug dealers in other investigations in which similar photographs were found.

¶ 51. Lock now contends that Officer Newport's testimony regarding the "purpose" of the photograph—

that it was likely meant to convey that Lock "ha[d] the world in [his] hands"—was improper because it unfairly compared Lock to other big drug dealers who posed for similar photographs with expensive worldly goods and who bragged that they had the world in their hands. As such, Lock argues that the testimony was not admitted for a proper purpose under *Sullivan*.

¶ 52. Lock cannot complain that Officer Newport's testimony regarding the purpose of the photograph violated the permissible-purpose requirement of *Sullivan* because defense counsel expressly elicited that testimony. Officer Newport's answer was directly responsive to the question. And even assuming that Officer Newport's testimony regarding Lock's reasons for taking the photograph was not admitted for a proper purpose under *Sullivan*, we conclude that any error was harmless. *See Thoms*, 228 Wis. 2d at 873. Lock does not contest that the photograph itself was admissible to link Lock to the Fiebrantz house where the victim's bodies were found. As we previously set forth, there was an abundance of evidence at trial establishing that Lock was a drug dealer who dealt in large quantities of drugs and cash. Officer Newport's testimony regarding why he believed Lock might have taken a photograph exhibiting his wealth could not have so influenced the jury's decision so as to give us doubt regarding the jury's conviction. *See Anderson*, 291 Wis. 2d 673, ¶ 114.

### *Louis Jackson*

¶ 53. In addition to his testimony that Lock asked him to perform surveillance on Chaney right before his death, Jackson testified that he had worked for Lock since the 1990s. When asked to define "work[ing],"

Jackson stated that he "[s]old drugs, prostitution, robbery, property flipping." As part of Jackson's testimony, the State introduced a chart of Lock's criminal organization with a picture of Lock at the top and numerous subordinates underneath him, including: Cooper, Hankins, Jr., Davis, Richardson, Jackson, and Lee. The State asked Jackson how the organization worked:

> Q And can you just tell us a little bit about how the drug organization worked in 1999 and 2000?
>
> A Well, we sold drugs — we bought drugs and sold them, and we robbed people for them.
>
> Q And who basically gave out the orders to do this?
>
> A Michael Lock.
>
> Q And can you talk about the quantities and the amount of money involved in this?
>
> A Oh, it was hundreds and hundreds of thousands of dollars. It was a key [kilo] of cocaine a week or day or so . . . .

Jackson also claimed that Lock "had police on the payroll."

¶ 54. As a rebuttal witness following Lock's testimony, Jackson repeated his claim that Lock was involved in "[p]rostitution, mortgage fraud, [and] drug dealing." Jackson also testified regarding a tape-recorded conversation he had with Lock in 2006 regarding a robbery the two were planning and that in 1999 or 2000 Lock was making "a lot" of money in the drug business.

¶ 55. Lock complains that Jackson's testimony "greatly accelerated" the admission of improper other-acts evidence, including testimony that: (1) Lock was

the head of a criminal organization with several subordinates that was involved in numerous criminal endeavors, to wit, prostitution, robbery, mortgage fraud, and drug dealing; (2) Lock "had police on the payroll"; (3) Lock and Jackson had a conversation in 2006 about planning a robbery; and (4) Lock was involved in money laundering.

■

¶ 56. Jackson's testimony that Lock was the head of a criminal organization involved with large drug transactions, prostitution, mortgage fraud, and robberies, and for which Jackson had worked since the 1990s was properly admitted and relevant to demonstrate Lock's motive (to keep his criminal enterprise in operation) and his intent (to assert his authority over those who were unwilling to cooperate in that enterprise). *See* WIS JI—CRIMINAL 275 (setting forth "motive" and "intent" as proper purposes under *Sullivan*). Furthermore, that Jackson was Lock's employee and had been engaged in a number of criminal enterprises with Lock explains why Lock permitted Jackson to accompany him to the Fiebrantz house while a grave was being dug in the backyard. That the two worked together to plot and rob drug dealers explained and added credence to Jackson's testimony that Lock asked him to follow and perform surveillance on Chaney—who was killed shortly after Jackson's surveillance concluded. The probative value of Jackson's testimony with respect to Lock's criminal organization was not outweighed by unfair prejudice, particularly given that Jackson was a low-level player in Lock's criminal organization and what the jury already knew about Lock's extensive drug activity. *See Sullivan*, 216 Wis. 2d at 772–73.

¶ 57. To the extent that Jackson's statement that Lock "had police on the payroll" was not admissible for a permissible purpose (although we make no such determination), we conclude that admission of the statement was harmless. *See Thoms*, 228 Wis. 2d at 873. It was the only reference to any such conduct over the course of a seven-day trial and Jackson was a low-level player in Lock's organization who gave no explanation as to how or why he believed the statement to be true. Given the vast evidence the State accumulated from eyewitnesses to Lock's crimes, we conclude that Jackson's offhanded statement that Lock "had police on the payroll" could not have unduly influenced the jury's verdict. *See Anderson*, 291 Wis. 2d 673, ¶ 114. This is particularly true because the State (not Lock) asked the trial court to strike that testimony from the record and the trial court did so and instructed the jury to disregard that testimony. We presume the jurors followed the trial court's instructions. *See State v. Truax*, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989).

¶ 58. Lock mentions in the course of criticizing Jackson's testimony that the "prosecutor . . . referred to [a] taped conversation with Lock that Jackson made in 2006," but Lock does not explain to this court why he believes that testimony was inadmissible. We will not construct his argument for him, and therefore, we do not address the issue.[12] *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider arguments unsupported by citation to legal

---

[12] Lock raises the admission of the 2006 tape recording of him and Jackson again when discussing his own testimony at trial.

195

authority); *see also League of Women Voters v. Madison Cmty. Found.*, 2005 WI App 239, ¶ 19, 288 Wis. 2d 128, 707 N.W.2d 285 (we do not decide undeveloped arguments).

¶ 59. Finally, with respect to Jackson's testimony, Lock complains that "[t]he prosecutor also elicited apparent money laundering evidence when he asked [Jackson] 'in 1999 or 2000 how much money Michael Lock was making in the drug business,' to which Jackson replied '[j]ust a lot . . . . I mean I can't put no figure on what he made because Mike don't let nobody count his money, but from all his assets he was doing real good.' " It is unclear to us how that question elicited evidence of money laundering and Lock does not otherwise explain why the question was improper. Again, we will not construct his arguments for him. *See Pettit*, 171 Wis. 2d at 646; *see also League of Women Voters*, 288 Wis. 2d 128, ¶ 19.

## Mario Redmond

¶ 60. Mario Redmond testified that he was acquainted with Lee (who testified that he assisted Lock during the Chaney homicide by tying up Chaney and ditching his car). Redmond told the jury that Lee told him after the bodies were discovered that he was involved in the robberies with Lock. Redmond stated that Lee told him that he helped tie up an individual during a robbery and that Lock then told Lee he could leave because "we do our own killings."

■■■
¶ 61. Even assuming that Lock has persuasively argued that Redmond's testimony was inadmissible other-acts evidence (although we make no such conclusion), we conclude that its admission was harmless. *See*

*Thoms*, 228 Wis. 2d at 873. Lee testified at trial that he participated in the Chaney homicide by helping Lock restrain Chaney and that Lock told him to ditch Chaney's car. Redmond's testimony merely duplicated Lee's. Redmond's statement that Lee told him Lock commented that "we do our own killings" was one statement given over the course of a long trial. In and of itself, the statement could not have changed the jury's decision. *See Anderson*, 291 Wis. 2d 673, ¶ 114.

¶ 62. The crux of Lock's argument actually appears to be that Redmond's testimony is double hearsay and therefore should not have been admitted, that is, that Redmond improperly testified that Lee told him that Lock told Lee that "we do our own killings." Again, however, Lock makes only conclusory statements in support of his contention that Redmond's testimony was inadmissible hearsay and cites to no statute or case authority in support of his argument. As such, we need not consider it. *See State v. Baldwin*, 2010 WI App 162, ¶ 47, 330 Wis. 2d 500, 794 N.W.2d 769.

### Steve Younker

¶ 63. Younker, who testified that he had known Lock for approximately fifteen years, was an inmate at the Milwaukee County Jail while Lock was also there following his arrest. Younker testified that Lock confessed to him in jail that he participated in both the Melendez-Rivas and Chaney homicides. Younker admitted at trial that the district attorney was recommending that the judge give Younker some consideration for his testimony in Lock's case and that Younker had testified as a State's witness in another case.

¶ 64. On cross-examination, defense counsel referenced a letter that Younker wrote to the district attorney, in which Younker wrote: " 'I will only talk to

you. My family and I are in grave danger once [defense counsel] is informed of this.' " Defense counsel asked Younker if the letter stated he would "be in some kind of danger?" On redirect, the State asked Younker why he feared Lock. Younker replied that Lock had "a reputation on the streets . . . [for] [b]eing a terrorist . . . [b]eing a killer."

¶ 65. Lock argues that Younker's testimony that Lock had a reputation as "a terrorist" and "a killer" was improper character evidence submitted in violation of WIS. STAT. § 904.04(1) prior to Lock's testimony. The State submits that the evidence was properly admitted to rebut Lock's defense that Lock has a peaceful character and lived openly in the community without a cache of weapons typical of large-scale drug dealers, as set forth in Lock's opening statement.

¶ 66. WISCONSIN STAT. § 904.04(1)(a) prohibits the admission of character evidence "for the purpose of proving that the person acted in conformity therewith on a particular occasion," except when "[e]vidence of a pertinent trait of the accused's character [is] offered by . . . the prosecution to rebut the same."

¶ 67. We conclude that even if the testimony that Lock had "a reputation on the streets . . . [for] [b]eing a terrorist . . . [b]eing a killer" was improperly admitted (although we make no such conclusion), its admission was harmless. Younker's comment on Lock's character is inconsequential when viewed against the testimony of the many eyewitnesses and participants to Lock's crimes. Furthermore, the defense elicited evidence from Younker, which cast doubt on his testimony. The jury was told that Younker was receiving consideration from the State for his testimony, that he had testified for the State on a previous occasion, and that he had access to

198

Lock's criminal complaint while incarcerated. As such, any error in admitting the testimony was harmless. *See Thoms,* 228 Wis. 2d at 873; *see also Anderson,* 291 Wis. 2d 673, ¶ 114.

### *Ed Hankins, Jr.*

¶ 68. Hankins, Jr., generally testified that in 2002 he was working with Lock dealing drugs and committing armed robberies, and he detailed their method of operation. Hankins, Jr., also stated that he set up the drug deal between Ford and Lock, at Lock's request, and helped Lock rob Ford when he arrived for the deal. Hankins, Jr., told the jury that during the robbery Lock instructed him "to threaten [Ford] and let him know that we [are] the Body Snatchers, you know, we rob people and . . . if they don't comply, they come up missing." When asked about Lock's role in the Body Snatchers, Hankins, Jr., identified Lock as the "brains behind the operation." He also told the jury that Lock "lived a lavish lifestyle" with expensive vehicles and jewelry.

¶ 69. Lock argues that Hankins, Jr.'s testimony that Lock was involved in countless other uncharged armed robberies and drug deals was impermissible other-acts evidence and was unnecessary to establish a relationship between Lock and Hankins, Jr. Lock further argues that Hankins, Jr.'s testimony regarding Lock's "lavish lifestyle" was irrelevant and prejudicial under *Sullivan.*

¶ 70. Like Jackson's testimony, Hankins, Jr.'s testimony that he and Lock had participated in other robberies and drug deals, and his testimony on how they generally operated, was admissible other-acts evi-

dence because it established Lock's motive to commit the crimes (to keep his criminal enterprise in operation) and his intent (to assert his authority over those who might be less willing to cooperate in that enterprise). Additionally, Hankins, Jr.'s testimony of Lock's lavish lifestyle set forth an additional motive to commit the crimes (to maintain his lavish lifestyle). The probative value of that testimony was high and greatly outweighed any prejudice. See id., 216 Wis. 2d at 772–73.

*Milwaukee Police Detective David Baker*

¶ 71. Detective Baker testified that nine days after Ford was kidnapped, as part of a drug investigation, Detective Baker and DEA agents stopped a truck driven by Davis with Lock as passenger. A search of Davis's pockets revealed two bags containing a total of approximately a quarter kilogram of cocaine (one-half of the amount stolen from Ford).

¶ 72. Lock challenges the admissibility of Detective Baker's testimony on the grounds that it does not satisfy the second prong of *Sullivan*, relevance. See id. He does not argue that the evidence was not admitted for a proper purpose under Wis. Stat. § 904.04(2) or that the probative value of the evidence is outweighed by unfair prejudice. See *Sullivan*, 216 Wis. 2d at 772–73. Instead, Lock argues that nothing in the record indicates any connection between the quarter kilogram of cocaine discovered on Davis and the half kilogram of cocaine stolen from Ford nine days before Davis's and Lock's arrests. Lock further argues that given the image the State presented of the size of Lock's criminal operation, it is more likely that if Lock had stolen Ford's cocaine he would have sold it in the intervening nine days and have obtained more drugs. Therefore, Lock

200

contends that Detective Baker's testimony regarding the drug bust is irrelevant to whether Lock kidnapped Ford.

¶ 73. " 'Relevant evidence' [is] evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Wis. Stat. § 904.01. Detective Baker's testimony that Lock was found to have a substantial amount of cocaine just nine days after the kidnapping and robbery of Ford is relevant under § 904.01. The facts show a substantial amount of cocaine (a half kilogram) was stolen from Ford, and only nine days later a substantial amount of cocaine (a quarter kilogram) was discovered in Davis's pocket when he was travelling with Lock. While Lock testified that the cocaine discovered on Davis was not the same cocaine stolen from Ford, a jury reasonably could conclude otherwise. Consequently, the testimony was relevant under the second prong of *Sullivan*. *See id.*, 216 Wis. 2d at 772–73.

### *Ed Hankins, Sr.*

¶ 74. The defense called Hankins, Sr., to the stand to impeach the testimony of his son, Hankins, Jr., by testifying to Hankins, Jr.'s animosity towards Lock. On direct examination, Hankins, Sr., testified that Hankins, Jr., "said he wanted to kill" Lock because Lock was "misusing" Hankins, Jr.'s sister, Shalonda Lock (Lock's wife). On cross-examination, the State asked Hankins, Sr., if Hankins, Jr., told him that "he didn't like the fact that [Lock] was prostituting his sister?"

Hankins, Sr., denied that Hankins, Jr., had told him that. Hankins, Jr., had testified that he did not dislike Lock.

¶ 75. Lock complains that it was improper for the State to elicit testimony from Hankins, Sr., that Lock was "prostituting" Shalonda because the testimony was improper other-acts evidence. Lock further states that because Hankins, Jr., had already testified and denied that Shalonda's relationship with Lock caused him any ill will toward Lock, the defense did not open the door to the testimony.

¶ 76. To begin, we note that Hankins, Sr., did not testify that Lock was "prostituting" Shalonda, or even that Hankins, Jr., believed Lock to be doing so. When the State asked Hankins, Sr., "Did [Hankins, Jr.] tell you he didn't like the fact that [Lock] was prostituting his sister?," Hankins, Sr., replied, "He did not tell me that." However, even if Hankins, Sr., had told the jury that Hankins, Jr., believed Lock to be prostituting his sister, we discern no error.

¶ 77. "The bias or prejudice of a witness is not a collateral issue and extrinsic evidence may be used to prove that a witness has a motive to testify falsely." *State v. Williamson*, 84 Wis. 2d 370, 383, 267 N.W.2d 337 (1978), *abrogated on other grounds by Manson v. State*, 101 Wis. 2d 413, 304 N.W.2d 729 (1981); *United States v. Abel*, 469 U.S. 45, 52 (1984). Hankins, Sr.'s testimony was admissible and relevant for that purpose. His testimony was offered by the defense to attack Hankins, Jr.'s credibility, imputing to Hankins, Jr., a bias against Lock. The defense opened the door to the State's question, allowing the State to ask Hankins, Sr., the basis for his belief that Hankins, Jr., disliked Lock. The jury was free to assess the credibility of Hankins,

Jr.'s testimony that he did not dislike Lock based on Hankins, Sr.'s testimony to the contrary.

¶ 78. Furthermore, any suggestion by the State during Hankins, Sr.'s testimony that Lock was prostituting Shalonda was not unfairly prejudicial. The jury had already heard Younker's testimony that Lock used Shalonda as part of a "monkey hustle" to lure Melendez-Rivas to Milwaukee. Younker defined a "monkey hustle" for the jury: "A monkey hustle is where you have a person and a female in the room, a hotel room, or whatever place, and the female — the victim is expecting some type of sexual favors, and they get all sexually excited and whatnot thinking about this and are not aware of what really is going to happen to them. It's a set up." Furthermore, Jackson, when confronted at trial with the fact that Lock had allegedly had sex with his ex-wife, told the jury "[it] was a rumor . . . [b]ut, I mean, I was intimate with [Lock's] girls, too, that how it go" with "our business, prostitution . . . . You sleep with mine, I sleep with yours." As such, the jury was already aware that Lock was allegedly involved with prostitution.

### Jerhonda McCray

¶ 79. McCray testified, as a rebuttal witness for the State, that she and Lock had been business partners, and were engaged in a phony appraisal scheme, defrauding banks. McCray testified that after the bodies were discovered she asked Lock, "did you know that those bodies were underneath there" and that Lock responded "uh-huh." McCray then asked Lock "did you do it," to which Lock said, "no, I didn't do it, I was there, but I didn't do it."

¶ 80. On cross-examination, defense counsel revealed that McCray had been indicted in federal court

with ten counts of wire and mail fraud. As part of her plea agreement with the United States Attorney's Office, she agreed to cooperate with the government in exchange for the dismissal of nine of the ten counts. McCray also revealed on cross-examination that at the time of Lock's arrest for the homicides, McCray was involved in a sexual relationship with Lock and tried to assist him in being released from jail, even though Lock had told her that he had been present when Melendez-Rivas and Chaney were killed. It was not until after she signed the plea agreement and after she discovered Lock had been involved with another woman while they were together that she revealed her conversation with Lock to the authorities.

¶ 81. Lock argues that while "it may well have been proper for the State to explore McCray's relationship with Lock" her testimony that she and Lock were engaged in mortgage fraud was not relevant and amounts to improper other-acts evidence. We disagree.

¶ 82. As Lock acknowledges, it was proper for the State to explore McCray's relationship with Lock to assist the jury in understanding their relationship in order to more accurately gauge her credibility. *See, e.g., Hunt*, 263 Wis. 2d 1, ¶¶ 58–59. The foundation of that relationship was apparently that the two were business partners engaged in mortgage fraud.

¶ 83. Furthermore, even if McCray's testimony that Lock was engaged in a mortgage fraud scheme was inadmissible as other-acts evidence, we conclude the admission was harmless. *See Thoms*, 228 Wis. 2d at 873. First, Lock's role in a mortgage fraud scheme—a non-violent, white-collar crime—does not suggest that Lock would also be involved in two violent homicides

and a kidnapping. Second, defense counsel elicited testimony from McCray demonstrating that she had much to gain from her testimony and did not come forward with her testimony until she was offered consideration from the United States Attorney's Office and until after she discovered that Lock had been unfaithful to her. Third, McCray only testified that Lock told her he was present when the deaths occurred. Her testimony was of little value when compared to the testimony of the many eyewitnesses who had first-hand knowledge of Lock's roles in the crimes. As such, we conclude that McCray's testimony that Lock was involved in a mortgage fraud scheme could not have influenced the jury's verdict. *See Anderson*, 291 Wis. 2d 673, ¶ 114.

### Michael Lock

¶ 84. Lock testified on his own behalf, and now complains that the State improperly questioned him about whether he agreed to rob a drug dealer in 2006 with Jackson. Lock argues that questions about the 2006 robbery elicited improper other-acts evidence as they were not admitted for a proper purpose, were irrelevant to the crimes alleged (which occurred between 1999 and 2002), and were unfairly prejudicial.

¶ 85. We conclude that the questions were proper to rebut Lock's testimony that Jackson was merely "a client" and that while they had occasionally "talked about drugs" they never engaged in a "drug transaction" together. *See State v. Schaller*, 199 Wis. 2d 23, 43, 544 N.W.2d 247 (Ct. App. 1995) (holding that the trial court did not erroneously exercise its discretion by admitting other-acts evidence for the purpose of impeaching a

witness's credibility). Jackson testified that he worked for Lock in the 1990s and detailed the workings of Lock's criminal organization. Lock attempted to distance himself from Jackson by downplaying his relationship with Jackson, testifying that Jackson was not a friend, but merely "a client" and that Jackson did not work for him selling drugs. Lock also denied being otherwise involved in any drug transactions with Jackson.

¶ 86. To refute Lock's testimony, the State read some transcribed portions of a tape-recorded conversation between Jackson and Lock from 2006, in which Lock is giving Jackson specific instructions to set up a drug dealer from Minnesota for a robbery. After the transcribed portions were read, Lock admitted that he recalled the conversation, and when asked if the conversation was about a drug deal, Lock responded, "Yes, essentially, yes."

¶ 87. We conclude that the questions about Jackson and Lock's 2006 robbery plans were proper and relevant to impeach Lock's testimony that Jackson was merely "a client" and that the two did not engage in drug transactions together. The questions were highly probative for that purpose, and did not unduly prejudice the jury because Lock's responses merely duplicated Jackson's testimony that the two worked together selling drugs and setting up drug dealers.[13] *See Sullivan*, 216 Wis. 2d at 772–73.

---

[13] Lock also argues that it was improper for the State to play the entirety of the 2006 tape-recorded conversation between Lock and Jackson to the jury, arguing that it "included profane and inflammatory language by the defendant" and was a collateral specific instance of conduct which may not be proved by extrinsic evidence. As Lock notes, the tape recording was not transcribed by the court reporter, and while Lock cites to Exhibit 51 in his brief, we cannot locate Exhibit 51 in the

¶ 88. Finally, Lock also contends that the alleged admission of other-acts evidence in the State's case-in-chief compelled him to testify, unfairly prejudicing him and abridging his Fifth Amendment privilege against compelled self-incrimination. At the postconviction hearing, Lock's trial counsel testified that but for the other-acts evidence he would have advised Lock not to testify. However, we conclude that because the other-acts evidence was properly admitted, for the reasons we set forth above, it could not have unfairly influenced Lock's decision to testify.

B. *Lock's trial counsel did not render ineffective assistance for failing to object to the admission of the alleged other-acts evidence.*

¶ 89. Lock argues that to the extent his trial counsel failed to obtain a pretrial ruling prohibiting the State from introducing the alleged other-acts evidence, or otherwise failed to object to each and every piece of alleged other-acts evidence set forth above, his trial counsel rendered ineffective assistance. Lock is mistaken.

---

record. It is Lock's responsibility to ensure that the record is sufficient to address the issues he raises on appeal. *See State v. McAttee*, 2001 WI App 262, ¶ 5 n.1, 248 Wis. 2d 865, 637 N.W.2d 774; Wis. Stat. Rule 809.15(1)(a)9. (The record on appeal shall include "[e]xhibits material to the appeal whether or not received in evidence."); Rule 809.15(2) (The parties receive ten-day notice of the provisional contents of the record prior to its transmittal to the appellate court.). When an appeal is brought on an incomplete record, we assume the record supports every fact essential to sustain the trial court's decision. *Suburban State Bank v. Squires*, 145 Wis. 2d 445, 451, 427 N.W.2d 393. Therefore, we assume that the trial court properly admitted the tape recording into evidence.

¶ 90. To succeed on a claim of ineffective assistance of counsel, a defendant must show that counsel's representation was deficient and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We uphold the trial court's factual findings unless clearly erroneous. *State v. Thiel*, 2003 WI 111, ¶ 21, 264 Wis. 2d 571, 665 N.W.2d 305. Whether counsel's performance is deficient or prejudicial is a question of law we review *de novo. State v. Jeannie M.P.*, 2005 WI App 183, ¶ 6, 286 Wis. 2d 721, 703 N.W.2d 694.

¶ 91. Because we have concluded that the other-acts evidence was properly admitted at trial, or that if the evidence was improperly admitted, that its admission was harmless, Lock cannot satisfy the second *Strickland* prong, requiring him to show that his trial counsel's performance was prejudicial. *See id.*, 466 U.S. at 687. When a defendant has failed to establish one prong of the *Strickland* analysis, we need not address the other. *Id.* at 697. As such, Lock's ineffective-assistance-of-counsel claim fails.

## II. The State did not violate its discovery obligations under *Brady*.

¶ 92. Lock argues that the State violated it disclosure obligations under *Brady*, when it failed "to disclose proffer letters or other evidence of consideration given to" Jackson and McCray, thereby violating Lock's right to due process. (Formatting omitted.) We disagree, addressing each witness in turn.

¶ 93. *Brady* holds that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S.

208

at 87. As such, to establish a *Brady* violation, a defendant must show that the State suppressed evidence favorable to the defendant and material to the determination of guilt. *State v. Harris*, 2004 WI 64, ¶¶ 12–13, 272 Wis. 2d 80, 680 N.W.2d 737; *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

¶ 94. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Evidence that is favorable to the accused includes both exculpatory and impeachment evidence. *Strickler*, 527 U.S. at 281–82. However, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Bagley*, 473 U.S. at 675 (footnote omitted). In Wisconsin, the duty of the district attorney to provide exculpatory evidence to the accused is codified in Wis. Stat. § 971.23(1)(h).[14] We independently review whether a due process violation has occurred, but we accept the trial court's findings of historical fact unless clearly erroneous. *State v. Sturgeon*, 231 Wis. 2d 487, 496, 605 N.W.2d 589 (Ct. App. 1999).

A. *The State did not violate its Brady obligations with respect to Jackson.*

¶ 95. Lock first argues that the State violated its *Brady* obligations when it failed to disclose: (1) the

[14] Wisconsin Stat. § 971.23(1)(h) requires the district attorney, upon demand, to disclose to the defendant "[a]ny exculpatory evidence" before trial.

209

proffer letter it offered to Jackson in exchange for his testimony; and (2) that Jackson knew that Lock had "snitched him out at a prior time." We disagree.

*The Proffer Letter*

██

¶ 96. By memorandum dated January 18, 2006, the State proffered consideration to Jackson in exchange for information and potential testimony on illegal drug dealing and "acts of violence" in Milwaukee. Jackson was promised use immunity for his statements, and if his cooperation was deemed acceptable and he testified truthfully, "the State may make [Jackson] a specific offer [of consideration] related to [his] case."

¶ 97. At trial, on recross-examination, defense counsel elicited the following evidence of consideration for Jackson's testimony:

Q Now, let me be correct, right, that you're not being prosecuted for any of the things you claim you did, right?

A Right.

Q And, in fact, the statements that you make in connection with your testimony or to the police, those statements are not being used against you; is that right?

A Yes, sir.

¶ 98. At the postconviction hearing, defense counsel said that he simultaneously represented Lock in several criminal matters for which he received "[t]housands of pages" of discovery. When asked if he had seen the State's proffer letter to Jackson before trial, defense counsel replied, "No. I don't believe so, no."

210

¶ 99. On cross-examination at the postconviction hearing, defense counsel acknowledged that, before Lock's trial, he was "pretty sure" he had received and read the transcript of Jackson's testimony at the John Doe proceeding, which discussed the terms set forth in the proffer letter.

¶ 100. Milwaukee Police Detective Tom Casper said that the John Doe transcript containing testimony on the proffer to Jackson appeared in two batches of discovery given to defense counsel. Officer Newport also testified that the terms of the proffer were in the transcript of Jackson's John Doe testimony and that the transcript was turned over to defense counsel. Officer Newport also testified that the proffer letter itself was disclosed to defense counsel before trial.

¶ 101. When denying Lock's postconviction motion, the postconviction court adopted the State's proposed findings of fact in their entirety. In doing so, the court found, among other things, that defense counsel "was aware of the actual proffer" to Jackson, having cross-examined Jackson at trial "on all the aspects of the proffer."

¶ 102. Lock argues that the documentary evidence in the record supports his claim that defense counsel did not receive the State's proffer letter to Jackson before trial. He focuses his argument on defense counsel's testimony at the postconviction hearing that he did not believe that he had received the letter before trial. Lock argues that the postconviction court's conclusion that defense counsel received the letter was in err because the court did not explicitly find defense counsel's testimony incredible and its conclusion directly contradicts that testimony. We disagree for several reasons.

211

¶ 103. First, the postconviction court's conclusion that defense counsel received the proffer letter before trial does not directly contradict defense counsel's testimony. Defense counsel was unsure if he had received the letter, stating only that he did not "believe[]" he had received it, but admitting that he had received thousands of pages of documents from the State before Lock's trial, including the transcript of Jackson's testimony at the John Doe proceeding, at which the proffer was discussed. Moreover, Officer Newport testified that the proffer letter was disclosed to defense counsel before trial. Even if defense counsel had affirmatively stated that he had not received the letter, the postconviction court's finding that he did receive it implicitly finds Officer Newport's testimony more credible. It was reasonable for the postconviction court to infer from the evidence that defense counsel was mistaken in his recollection. There was no need to explicitly find defense counsel incredible.

¶ 104. Second, there was substantial evidence in the record supporting the postconviction court's finding that defense counsel did receive the letter prior to trial. Officer Newport testified that the letter was disclosed to defense counsel before trial, and both Officer Newport and Detective Casper testified that, at the very least, the details of the proffer were included in the transcript of Jackson's testimony during the John Doe proceeding, which appeared in two batches of discovery given to defense counsel.

¶ 105. We are to accept the postconviction court's findings of historical fact unless they are clearly erroneous. *Sturgeon*, 231 Wis. 2d at 496. Here, the postconviction court's finding that defense counsel received the proffer letter to Jackson before trial is supported by the testimony at the postconviction hearing. As such, the

212

State did not violate *Brady* for failing to disclose the letter. *See id.*, 373 U.S. at 87.

¶ 106. Furthermore, defense counsel successfully elicited testimony from Jackson demonstrating for the jury that Jackson was not being prosecuted for his crimes. The fact that the terms of his agreement with the State were memorialized in a letter is irrelevant. Because the evidence was not material, the State was not obligated to disclose it. *See Harris*, 272 Wis. 2d 80, ¶¶ 12–13.

*Evidence that Lock was a "Snitch"*

■■■■

¶ 107. Lock also argues that the State violated *Brady* when it failed to disclose to the defense before trial that Jackson was aware that Lock had "snitched him out at a prior time," giving Jackson a revenge motive to testify against Lock. Again, we disagree.

¶ 108. After the trial, by affidavit, defense counsel claimed that he was unaware that Jackson knew Lock had "tried to 'rat' " Jackson out to federal authorities until after trial when the information appeared in a local newspaper. Officer Newport testified during the postconviction hearing that Jackson told him that he was aware that Lock "snitched him out" during a debriefing in 2005.

¶ 109. We conclude that no due process violation occurred because Jackson's "revenge motive" was not material to Lock's conviction. *See Bagley*, 473 U.S. at 682. Jackson was not an indispensable witness. The only eyewitness testimony he provided was that he observed a hole being dug in the back of the Fiebrantz house and that he performed surveillance on Chaney and watched Chaney enter the 53rd Street house. Other

more involved participants in the crimes, including Davis, Lee, and Hankins, Jr., provided eyewitness testimony of the details of the crimes themselves. The evidence against Lock was overwhelming even without Jackson's testimony.

B. *The State did not violate its Brady obligations by failing to disclose the proffer letter to McCray.*

¶ 110. Lock complains that the State violated *Brady* when it failed to disclose to the defense before trial that McCray had received a proffer letter and plea agreement from the federal authorities and that she had given inconsistent statements to law enforcement. We disagree.

*Proffer Letter*

¶ 111. In April 2008, McCray faced ten federal charges of wire fraud, and pursuant to a plea agreement, she agreed to plead guilty to one count, carrying a maximum imprisonment term of twenty years and a maximum extended supervision of three years. She also agreed to "cooperate with the government in its investigation of this and related matters" and to testify truthfully if asked to do so. The government agreed to "recommend a sentence at the low end of the applicable sentencing guideline range," including the possibility of a downward departure from the guidelines. Thereafter, the government sent McCray a proffer letter, dated April 21, 2008, offering her use immunity for information and truthful testimony about "criminal activity" in Milwaukee and elsewhere.

¶ 112. At Lock's trial, the State called McCray as a rebuttal witness. On cross-examination, defense counsel elicited the fact that McCray was facing State

214

felony charges, as well as ten federal charges for wire fraud, and that, in exchange for her cooperation, she had reached a plea agreement under which she would plead guilty to a single count of wire fraud, thereby greatly reducing her federal prison exposure.

¶ 113. At the postconviction hearing, defense counsel said, "I don't think so, no" when asked if the State had disclosed McCray's plea agreement and proffer letter to the defense before trial.

¶ 114. Detective Casper testified at the postconviction hearing that after Lock testified at trial, the State received a message that McCray may have useful impeachment evidence against Lock. Officer Newport testified that defense counsel was given a chance to interview McCray before she testified in rebuttal for the State.

¶ 115. The postconviction court, by accepting the State's findings of fact in their entirety, found that defense counsel was aware of the plea agreement at trial, because counsel had elicited such evidence at trial. As such, the postconviction court concluded that "no discovery violations" occurred.

¶ 116. First, we conclude that the postconviction court's finding that defense counsel was aware of the proffer letter and the terms of the plea agreement at the time of the trial based upon the fact that defense counsel cross-examined McCray on the terms of the plea agreement during the trial and used the information to impeach her testimony was not clearly erroneous.

¶ 117. Second, even if the State had failed to disclose the proffer letter and the terms of the plea agreement prior to trial, Lock fails to convince us that the omission meets the *Brady* materiality prong. In other words, we conclude that the failure to disclose

does not "undermine [our] confidence in the outcome." *See Bagley*, 473 U.S. at 682.

¶ 118. As we have seen, defense counsel successfully cross-examined McCray on the terms of the plea agreement, revealing to the jury that McCray did not tell the State of Lock's confession until after she was told she would receive substantial consideration for her cooperation. While defense counsel testified that he was "winging it" and simply relying on his basic knowledge about what is typically included in such agreements when cross-examining McCray, he did so successfully, revealing McCray's vulnerabilities to the jury. As such, Lock was not denied his right to due process for any failure by the State to disclose its plea agreement or proffer letter with McCray because the proffer letter was not material. *See Harris*, 272 Wis. 2d 80, ¶¶ 12–13.

*Inconsistent Statements to Law Enforcement*

¶ 119. Lock also claims the State failed to properly disclose "reports containing prior statements McCray made to investigators," which would have revealed that "McCray never told the FBI that Lock told her he knew there were bodies buried on his property." Lock claims the reports were material because without them defense counsel was unable to show the jury that McCray's testimony was inconsistent with her prior statements to law enforcement. We fail to see how this evidence is material. McCray admitted that when Lock was first arrested she attempted to help him get out of jail until after she was offered a deal from the United States Attorney's Office and after she discovered Lock had been unfaithful to her. That McCray failed to immediately tell the FBI investigators that Lock told

216

her he witnessed the crimes was not new information to the jury and does not undermine our confidence in the outcome. *See id.*

## III. The State did not violate Lock's right to reciprocal discovery under Wɪs. Sᴛᴀᴛ. § 971.23.

¶ 120. Lock argues that the State violated his right to reciprocal discovery under Wɪs. Sᴛᴀᴛ. § 971.23, when it failed to disclose to him before trial statements he made to McCray. More specifically, Lock argues that the State was obligated to disclose to him McCray's assertions that when she asked Lock in 2005 about the bodies found at the Fiebrantz house and "did you do it," Lock replied, "I was there, but I didn't do it." The State contends that McCray was a *bona fide* rebuttal witness and as such the State was not obligated to give Lock a written summary of his statements to McCray, but that even if it was obligated to provide the statements, the State's failure to do so was harmless.

¶ 121. The State must disclose on demand "[a] written summary of all oral statements of the defendant which the district attorney plans to use in the course of the trial and the names of witnesses to the defendant's oral statements." Wɪs. Sᴛᴀᴛ. § 971.23(1)(b). The State has a continuing duty to disclose material that fits within the scope of a demand. Wɪs. Sᴛᴀᴛ. § 971.23(7).

¶ 122. We analyze alleged discovery violations in three steps, each of which poses a question of law reviewed without deference to the trial court. *State v. DeLao*, 2002 WI 49, ¶¶ 14–15, 252 Wis. 2d 289, 643 N.W.2d 480. First, we decide whether the State failed to disclose information it was required to disclose under

217

WIS. STAT. § 971.23(1). *DeLao*, 252 Wis. 2d 289, ¶ 14. Next, we decide whether the State had good cause for any failure to disclose under § 971.23(1). *DeLao*, 252 Wis. 2d 289, ¶ 15. Absent good cause, the undisclosed evidence must be excluded. *See id.* However, if good cause exists, the circuit court may admit the evidence and grant other relief, such as a continuance. *Id.*, ¶ 51; WIS. STAT. § 971.23(7m). Finally, if evidence should have been excluded under the first two steps, we decide whether admission of the evidence was harmless. *DeLao*, 252 Wis. 2d 289, ¶ 59.

¶ 123. We conclude that even assuming that the State was required to disclose Lock's statements to McCray before trial, and even if the State failed to establish good cause for its omission, its failure to do so was harmless. *See id.* The jury heard that McCray was a disgruntled ex-girlfriend who was receiving substantial consideration from the federal government for her cooperation in the case against Lock. Furthermore, the entirety of her testimony was that Lock told her he knew the bodies were in the backyard but that "he didn't do it." Lock did not explain his role in the deaths or otherwise elaborate on how Melendez-Rivas or Chaney died. As we have already established, there were several other vastly more reliable witnesses at the trial who testified as eyewitnesses to Lock's role in the crimes.

## IV. A new trial is not required in the interest of justice.

¶ 124. In a last ditch effort to overturn the jury's verdict, Lock repeats all of the arguments he makes above, and asks us to order a new trial in the interest of justice pursuant to WIS. STAT. § 752.35. He contends

that so much improper conduct was presented at trial that the real issues in controversy were not fully tried and that the jury did not have the opportunity to hear important impeachment evidence that goes to the credibility of the State's witnesses. "We have found each of these arguments to be without substance. Adding them together adds nothing. Zero plus zero equals zero." *See Mentek v. State*, 71 Wis. 2d 799, 809–10, 238 N.W.2d 752 (1976).

¶ 125. The State presented a strong case against Lock, the foundation of which was the testimony of several witnesses who personally observed and participated in the kidnapping and robbery of Ford and the deaths of Melendez-Rivas and Chaney. On appeal, Lock attempts to nit-pick at the evidence, complaining that some of the witnesses' peripheral testimony is inadmissible as improper other-acts evidence; however, Lock is unable to attack the heart of the State's case. After reviewing the record, there is no doubt in our minds that Lock received a fair trial, the result of which, given the heft of the State's evidence, was guilty. There is simply no reasonable possibility that the errors Lock complains of, even if true, contributed to his conviction. *See Sullivan*, 216 Wis. 2d at 793.

*By the Court.*—Judgments and order affirmed.