COURT OF APPEALS
DECISION
DATED AND FILED

June 25, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP263**

Cir. Ct. No. 2001CF89

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

JOHN V. GROSS, JR.,

    DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Juneau County: BERNARD N. BULT, Judge. *Affirmed*.

Before Blanchard, Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  In 2002, John Gross was convicted of first-degree intentional homicide as a party to the crime.  Gross argues that he is entitled to an evidentiary hearing and a new trial, or a new trial in the interest of justice, based on newly discovered medical evidence, or in the alternative based on his trial counsel's failure to consult with a medical expert.  Separately, he contends that the restitution order must be vacated because it was entered outside a statutory time limit and was entered without notice.  We affirm.

## BACKGROUND

¶2    Following the death of three-year-old Lucas Zietlow on November 26, 2000, the State charged Amy Zietlow (Lucas's mother) and Gross (Amy's boyfriend) with first-degree intentional homicide as parties to the crime for Lucas's death.  Amy pled no contest to first-degree reckless homicide but Gross's case went to trial.  We now summarize pertinent evidence adduced at trial.

### I. The Trial

#### Evidence of Abuse in the Month Before Lucas's Death

¶3    In the middle of October 2000, Gross and Amy began dating and moved in together.  Members of Amy's family testified that, shortly after Gross and Amy entered into a relationship, they heard or saw evidence that Gross was abusing Lucas.  For example, Lucas told at least three witnesses that Gross had hit or punched him in the stomach.  Some witnesses also testified that Lucas reported that Gross had painfully cracked Lucas's knuckles and bent his fingers backward.  Witnesses testified that they saw Lucas cry, recoil, and move away from Gross when he came near Lucas, and that Lucas said that he did not like Gross.

¶4   Belentina Nowicki, Amy's landlord who lived nearby, testified that, on November 15, 2000, she saw Lucas at the door of his home, afraid and upset, saying that he could not find his mom. When Nowicki suggested that Lucas look for Amy in her bedroom, Lucas told her that he could not do that because Gross was in the bedroom. Nowicki testified that Lucas was shaking and crying and begging Nowicki to take him with her to her house.

*Events on the Day of Lucas's Medical Crisis*

¶5   At around 7:00 p.m. on November 21, 2000, Amy and Gross brought Lucas to the Necedah Village Hall, which had an attached ambulance bay. Amy told medics at the hall that Lucas "had been sick and running a fever and hadn't felt good that day." Emergency medical personnel who treated Lucas on the scene testified that he had a weak pulse, difficulty breathing, and was very pale.

¶6   An ambulance transported Lucas to Hess Memorial Hospital. Within ten minutes of arriving at the hospital, Lucas's heart stopped, and he went into cardiac arrest for approximately 30 minutes. Lucas was subsequently med-flighted to the University of Wisconsin Children's Hospital (UWCH) in Madison. Several days later, doctors declared Lucas brain dead and life support was withdrawn.

*Medical Evidence*

¶7   The State presented three principal expert witnesses to explain the medical cause of Lucas's death. Dr. Timothy Corden, Lucas's treating physician at UWCH, concluded that, when Lucas arrived at the hospital, he was in traumatic shock due to multiple injuries to organs in his abdomen. Corden noted that a CT scan of Lucas's abdomen revealed that his liver had been nearly split into two

separate pieces.  Corden concluded that the injury to Lucas's liver led to blood loss, which in turn caused his cardiac arrest, brain damage, and death.  In Corden's opinion, Lucas was a victim of child abuse.

¶8      Dr. Robert Huntington, III, a pathologist for the University of Wisconsin—Madison, performed an autopsy on Lucas.  Huntington testified that Lucas had bruises on his scalp, brain, liver, pancreas, stomach, lungs, groin, and testicles.  He concluded that Lucas had three major areas of trauma:  his head, trunk, and genitals.  Like Corden, Huntington concluded that Lucas had been the victim of child abuse and that his death was a homicide.

¶9      Dr. Shahriar Salamat, a neuropathologist for the University of Wisconsin in Madison, performed an autopsy on Lucas's brain.  Salamat concluded that Lucas had subdural and "shearing" hemorrhages in his brain, which Salamat believed were the result of direct head trauma.

¶10     Both Salamat and Huntington concluded that a significant level of force would have been required to cause Lucas's head trauma.

*Other Acts Evidence*

¶11     The State introduced "other acts" evidence that, before Gross entered into a relationship with Amy, he had physically abused the sons of two of his past girlfriends.[1]  One alleged incident involved bruising to an 18-month-old boy's buttocks, lower back, and thigh.  Gross initially denied having caused the

---

[1] "Evidence of other crimes, wrongs, or acts under" WIS. STAT. § 904.04(2)(a) is generally known as "other acts evidence."  *See generally* **State v. Sullivan**, 216 Wis. 2d 768, 576 N.W.2d 30 (1998) (discussing Wisconsin's "other acts evidence" jurisprudence).  All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

injuries, but, during a subsequent argument with the boy's mother, admitted to causing them, stating: "I should have killed him." The other alleged incident involved injuries to a 17-month-old boy. The boy was brought to the emergency room after his grandmother observed the boy's "eyes rolling back into his head." Gross originally stated that the boy had fallen off a plastic slide in the house and hit his head on a piano. However, during a subsequent argument with the boy's mother, Gross admitted that he had caused the injuries and stated that the boy "deserved it." The circuit court admitted this "other acts" evidence for the limited purposes of assessing "intent, identity and absence of mistake or accident."

*Inmate Testimony*

¶12 Two men who were housed with Gross in jail during December 2000 testified about what Gross allegedly told them. John Rowland testified that Gross told him that Amy had kicked Lucas and that Gross had punched him. According to Rowland, Gross also said that he then shook Lucas and told him to "be a man, stop crying." Rowland also testified to certain other details of the circumstances of the case, including that Lucas had been med-flighted to Madison and that Amy was also being charged with a crime. Additionally, according to Rowland, Gross stated that the authorities "couldn't tell how many times [Lucas] had been punched or kicked because the CPR bruised him up, broken the chest tube."

¶13 Sheldon Zaccanti testified that Gross said that he had "struck and kicked" Lucas. According to Zaccanti, Gross said that he was the disciplinarian of the household because Amy "let the children walk all over her." Similar to Rowland's testimony, Zaccanti also testified that Gross told him that the authorities would "have a hard time telling what happened" to Lucas because the CPR Lucas received would have "busted [him] up ... inside."

¶14 Both Rowland and Zaccanti testified that they had not received a deal or consideration for their testimony against Gross. Rowland testified that he came forward with his testimony because he did not "like to see little children treated that way."

*Gross's and Amy's Version of Events*

¶15 Neither Gross nor Amy testified at trial; however, prior statements each had made were introduced through the testimony of other witnesses and through law enforcement recordings, transcripts, and reports.

¶16 During initial interviews, Amy told police that Lucas had some flu-like symptoms on the day that he was brought to the hospital, while Gross said that Lucas had slipped and fallen on a deck. In these initial interviews, neither Gross nor Amy accused the other regarding the circumstances of Lucas's injuries. However, both of their stories soon changed.

¶17 Sue Crawley, a friend of Amy's, testified that, on November 23 and 25, Amy called her on the telephone. Crawley testified that Amy was "[v]ery upset, crying," and that Amy had told her, "[H]e beat my son." According to Crawley, Amy later repeated three times: "He killed my baby."

¶18 On November 27, when Amy was again interviewed by police, she told a detective that she saw Gross hit Lucas in the abdomen, which she said resulted in Lucas going pale and becoming unconscious. In December 2000, Amy wrote a letter to an agent at the Wisconsin Department of Justice, alleging that Gross had threatened her with harm if she told police what had happened to Lucas. In February 2001, after Gross had been charged with causing Lucas's death, Amy recanted her statement that she saw Gross hit Lucas. Finally, in March 2001, Amy

told police that, while Lucas was being treated, Gross suggested that she tell authorities that she may have hit Lucas with her car.

¶19   Approximately a week after his initial interview with police, while in custody on another matter, Gross requested to make another statement. During this interview, Gross told police that he had seen Amy strike Lucas in the head, heard Lucas's shoulder or head "clunking on the floor," and then saw Amy kick Lucas three times in the abdomen. Gross said that he had failed to disclose this information earlier because he did not want Amy to lose custody of her children.

## II. Procedural History and the Current Appeal

¶20   On July 2, 2002, the jury convicted Gross of first-degree intentional homicide as a party to the crime. The circuit court sentenced Gross to life in prison, consecutive to another sentence he was then serving, with eligibility for extended supervision following 50 years of initial confinement. The circuit court also ordered Gross to pay restitution for Lucas's funeral expenses. In 2003, Gross filed a direct appeal, challenging the admission of the other acts evidence. This court affirmed his conviction, rejecting Gross's argument that the other acts evidence was improperly admitted.[2] In 2009, Gross filed a postconviction motion to vacate his DNA surcharge, which the circuit court denied. Gross appealed, and this court reversed.[3]

---

[2] *See* **State v. Gross**, No. 2003AP1203-CR, unpublished slip op. (WI App June 24, 2004).

[3] *See* **State v. Gross**, No. 2009AP1461-CR, unpublished op. and order (WI App Mar. 12, 2010).

¶21    In 2016, Gross filed a pro se motion for a new trial under WIS. STAT. § 974.06. The circuit court subsequently appointed appellate counsel for Gross. Gross later filed a pro se motion seeking to vacate the restitution order. After briefing from counsel for both parties, the circuit court denied both of Gross's motions without a hearing. This appeal follows.

## DISCUSSION

¶22    Gross raises the following issues on appeal. First, he argues that he is entitled to an evidentiary hearing and a new trial based on newly discovered medical evidence. Second, in the alternative, if this court determines that the medical evidence was not newly discovered, he asserts that his trial counsel's failure to consult with a medical expert constitutes ineffective assistance of counsel and that his motion was sufficient to warrant an evidentiary hearing. Third, based on this same medical evidence, Gross argues that he is entitled to a new trial in the interest of justice. Fourth, Gross contends that the restitution order must be vacated because it was entered outside the statutory time limit of WIS. STAT. § 973.20 and was entered without notice, which he asserts constitutes a new factor.[4] For the reasons set forth below, we reject Gross's arguments.

---

[4] The State argues that Gross's claims under WIS. STAT. § 974.06 are procedurally barred pursuant to *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 185, 517 N.W.2d 157 (1994). Gross responds that there were sufficient reasons for not raising these issues in his previous appeals. We decline to address whether Gross is procedurally barred from raising the arguments he makes in this appeal. Instead, we address Gross's substantive arguments and conclude that they are without merit.

### I. Postconviction Motion Standards

¶23 The circuit court denied Gross's postconviction motions without holding an evidentiary hearing. A circuit court is required to hold a hearing on a defendant's WIS. STAT. § 974.06 motion only if the material facts alleged in the motion would, if true, entitle the defendant to relief. *See State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. Whether the motion alleges sufficient material facts is a question of law, which this court reviews de novo. *Id.* However, the circuit court has the discretion to deny a hearing "if all the facts alleged in the motion, assuming them to be true, do not entitle the movant to relief; if one or more key factual allegations in the motion are conclusory; or if the record conclusively demonstrates that the movant is not entitled to relief." *Id.*, ¶12 (footnote omitted).

### II. Newly Discovered Evidence

¶24 Relying on newly discovered medical evidence provided by a forensic pathologist, Gross argues that the jury was deprived of information that supported his defense. Specifically, he asserts that the new evidence shows that: (1) causation of Lucas's abdominal injuries did not require the high degree of force described by some of the State's experts; (2) Lucas's brain injuries were not the result of direct impact trauma but instead resulted from the liver injury, which supports Gross's account of seeing Amy strike Lucas in the head prior to kicking him in the abdomen; (3) causation of Lucas's brain injuries did not require the degree of force testified to by the State's witnesses, which supports Gross's description of seeing Amy strike Lucas in the head and causing him to fall; and (4) Lucas's death was not the result of Shaken Baby Syndrome. These arguments are addressed below.

¶25 "In order to set aside a judgment of conviction based on newly-discovered evidence, the newly-discovered evidence must be sufficient to establish that a defendant's conviction was a 'manifest injustice.'" *State v. Plude*, 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42 (quoted source omitted). Whether a conviction has resulted in a "manifest injustice" is subject to a two-part inquiry. *See id.*, ¶33. Under the first part of the inquiry, the defendant must show by clear and convincing evidence that "'(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative.'" *Id.*, ¶32 (quoting *State v. McCallum*, 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997)). If a defendant meets this standard, the circuit court must determine "'whether a reasonable probability exists that a different result would be reached in a trial'" based on the newly discovered evidence. *See State v. Avery*, 2013 WI 13, ¶25, 345 Wis. 2d 407, 826 N.W.2d 60 (quoting *McCallum*, 208 Wis. 2d at 473). "A reasonable probability of a different result exists if there is a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to the defendant's guilt." *Id.*

¶26 For purposes of resolving this appeal, we assume without deciding that Gross's motion satisfied the first two prongs of the newly discovered evidence standard, namely, that all of the evidence was discovered after conviction and that Gross was not negligent in seeking the evidence. *See Plude*, 310 Wis. 2d 28, ¶32. However, we conclude that Gross's newly discovered evidence claim fails because some of the new evidence was not material to an issue in the case, other evidence, even if material, was cumulative, and none of the new evidence creates a reasonable probability of a different result. *See id.*

10

¶27    The new evidence upon which Gross relies consists of a forensic pathology report written by Dr. George Nichols, II.[5]   Nichols is a licensed physician, certified in anatomic pathology, clinical pathology, and forensic pathology, who was retained by Gross's current postconviction counsel to conduct an independent cause of death determination.   Among other items, Nichols reviewed Lucas's medical records, the autopsy report, the autopsy photographs, and a selection of autopsy slides.   He also reviewed "synopses" of the trial testimony of Huntington, Salamat, and Corden.   Nichols then prepared a report containing his analysis of the medical evidence.

¶28    We note at the outset that Nichols's report agrees with the State that the cause of Lucas's death was homicide.   However, Gross argues that Nichols's report bears on four disputes between the parties at the time of trial.   We address Gross's arguments with respect to each alleged dispute below, providing additional pertinent facts as necessary.

¶29    The first alleged dispute relates to the degree of force necessary to cause the laceration of Lucas's liver.   Nichols concluded that the force required for such an injury could be produced by a blow from a person's fist or foot or by an accident such as falling onto the handlebars of a bicycle.   Gross argues that this conclusion undermines the State's theory of the case in that Lucas's injuries do not require the high degree of force described by Corden and Huntington.   Gross

---

[5]  Gross also cites new medical studies that he alleges cast doubt on some of the medical evidence adduced at trial.   So far as we can tell, Gross utilizes these reports for the limited purpose of supporting Nichols's report and analysis.   However, if Gross means to make any arguments based exclusively on these studies, independent of the Nichols material, we reject these arguments as undeveloped. *See Herder Hallmark Consultants, Inc. v. Regnier Consulting Grp., Inc.*, 2004 WI App 134, ¶16, 275 Wis. 2d 349, 685 N.W.2d 564 ("Ordinarily, we will not address undeveloped arguments ....").

suggests that Nichols's conclusion also supports Gross's account to police that he saw Amy kicking Lucas.

¶30    Gross's argument on this point fails at the outset because he has mischaracterized Corden's and Huntington's testimony.   Both Corden and Huntington testified in general terms about the level of force that would have been required to cause Lucas's abdominal injuries.   While Corden testified that he had seen liver damage similar to Lucas's in car accidents or when a child had been kicked by a horse or a cow, Corden never testified that such extreme events would have been *required* to cause Lucas's abdominal injuries.   To the contrary, Corden testified that an "average adult" could have caused Lucas's injuries with a kick:

> Q    Now, the damage to the liver itself, that could be
>        caused by a kick, could it not?
>
> A    Yes, it could.
>
> Q    And human beings would cause that injury?
>
> A    Yes.
>
> Q    Would it have to be somebody who was necessarily
>        a large person or any particular qualifications?
>
> A    I think an average adult could inflict that much
>        directed injury to cause this damage.

¶31    In fact, Nichols's report approvingly notes Corden's testimony that a kick by an average adult could lacerate the liver, and states that Corden's testimony "is generally scientifically based and supported by evidence based literature."   Similarly, Huntington concluded that Lucas's abdominal injuries could have been caused by someone "place-kicking" him,[6] which is consistent

_____

[6] Huntington explained that by "place-kicking," he meant a kick that "has a wind up and [follow] through," most likely with "a running start of a place-kicker."

with Nichols's conclusion that a kick could have caused Lucas's abdominal injuries. As a result, Nichols's conclusion that the force required for Lucas's liver injury could be produced by a blow from a person's fist or foot is cumulative and does not create a reasonable probability of a different result. *See Plude*, 310 Wis. 2d 28, ¶32; *Avery*, 345 Wis. 2d 407, ¶25.

¶32 The second purported dispute concerns the timing of Lucas's injuries. Gross told police that the injuries to Lucas's head occurred prior to the abdominal injuries. In closing argument, the prosecutor argued that Salamat's testimony contradicted Gross's statement that the head injuries occurred first because the amount of force administered to Lucas's head would have rendered Lucas unconscious:

> Now, with respect to what [Gross] said concerning Amy Zietlow performing the injuries, he said the head injury occurred first, remember that, he says the first thing he heard, he thought he heard a clunk, not sure, but there was a clunk. Now, the Dr. says that the head injury pretty unlikely that occurred first, why, pretty obvious, Dr. Salamat with the extent of head injuries this kid should be unconscious, or unconscious shortly thereafter.

Gross relies on Nichols's conclusions that Lucas's brain had no subdural hemorrhaging and that the brain swelling was not the result of a mechanical injury to the brain. Instead, Nichols concluded, the brain swelling was the result of Lucas's traumatic liver injuries, which prevented an adequate supply of blood and oxygen to the brain, causing hypoxic ischemic encephalopathy. According to Gross, Nichols's conclusions undermine the State's theory, advanced in its closing argument, that the brain injuries could not have preceded the abdominal injuries. We are not persuaded.

13

¶33    We first observe that, to the extent Gross's argument relies on the premise that Lucas's brain injuries were not caused by direct impact but were an indirect consequence of the liver injury, that premise appears to undercut Gross's theory at trial that the brain injuries described by the State's experts were caused by Amy striking Lucas's head.  Thus, Nichols's conclusion on this point appears to hurt rather than help Gross's defense.  Assuming, however, that Gross means to suggest that his description of Amy striking Lucas in the head explained only the scalp bruising referenced by Huntington and Nichols, as opposed to any brain injuries, his argument fares no better.

¶34    First, Salamat did not testify that Lucas's brain injuries preceded his abdominal injury.  Salamat merely testified that Lucas's brain injuries would likely have caused him to lose consciousness shortly after the injury occurred.  To the extent that the State's closing argument suggested that Salamat testified regarding the timing of the injuries, that statement is not supported by the evidence.  It is well established that counsel's remarks and closing arguments are not evidence.  *See, e.g.*, **State v. Wenk**, 2001 WI App 268, ¶9, 248 Wis. 2d 714, 637 N.W.2d 417.  The jury was so instructed and was further instructed to disregard remarks not supported by the evidence.[7]  Jurors are presumed to have followed jury instructions.  *See* **State v. LaCount**, 2007 WI App 116, ¶17, 301 Wis. 2d 472, 732 N.W.2d 29.

---

[7] The circuit court gave two pattern instructions on this issue:  WIS JI—CRIMINAL 157 ("Remarks of the attorneys are not evidence.  If the remarks suggested certain facts not in evidence, disregard the suggestion.") and WIS JI—CRIMINAL 160 ("Consider carefully the closing arguments of the attorneys, but their arguments and conclusions and opinions are not evidence. Draw your own conclusions from the evidence, and decide upon your verdict according to the evidence, under the instructions given you by the court.").

¶35 Moreover, Salamat's testimony that Lucas would likely have lost consciousness shortly after the brain injuries was not necessarily inconsistent with Gross's statement to police that Lucas's head injuries occurred prior to his abdominal injuries.

¶36 We also note that Nichols's conclusions are cumulative to those of Corden with respect to Lucas's cause of death. *See Plude*, 310 Wis. 2d 28, ¶32. Corden testified that the laceration of Lucas's liver produced cardiac arrest and lack of oxygen and blood to Lucas's brain, leading to severe brain damage, including swelling, and ultimately resulting in death. Further, Corden testified that he was not qualified to comment regarding blows to Lucas's brain, if any, because he did not find evidence of internal head injuries during his treatment of Lucas and because brain damage was inevitable due to the traumatic shock, cardiac arrest, and restriction of blood and oxygen flow that Lucas experienced as a result of the liver laceration.

¶37 Based on the foregoing, Nichols's conclusion that Lucas's brain injuries resulted solely from his liver injury is immaterial and cumulative to the issue of the timing of the injuries and does not create a reasonable probability of a different result. *See Plude*, 310 Wis. 2d 28, ¶32; *Avery*, 345 Wis. 2d 407, ¶25.

¶38 As best we can discern, the third alleged dispute concerns the degree of force required to cause Lucas's brain injuries (as opposed to the force necessary to cause the liver injury, discussed above). Gross asserts that the prosecutor argued in closing that the medical evidence did not support Gross's statement that Amy struck Lucas in the head causing him to fall because such conduct could not produce the force needed to cause the brain injuries Salamat described. In support

of this assertion, Gross points to the following excerpts from the prosecutor's closing argument:

> Dr. Salamat took you through the injuries of the head, he spoke about the severe trauma or severe hematoma to the dura matter[. W]e are talking about a significant blow to Lucas' head.... The shearing, if you[] remember, was this a substantial factor in death, of course it was a substantial factor. How much force, third story window, significant amount of force, how much force would you have to apply to a little person's head to cause that amount of damage, he intended to kill him, or practically certain to cause death.

Although unclear, Gross appears to argue that Nichols's conclusion that there was no evidence of a mechanical injury to Lucas's brain undermines the portion of the closing argument just quoted.[8] Gross's arguments are unconvincing.

¶39 First, contrary to Gross's interpretation, we do not construe this portion of the closing argument as a commentary on the credibility of Gross's account of seeing Amy cause Lucas's head injuries. Instead, these excerpts appear to support a theory that the force that was used to cause injury to Lucas's brain showed an intent to kill Lucas or that such force was very likely to cause death. Thus, the entire premise of Gross's argument appears to be unsupported.

¶40 Furthermore, Salamat's third-story remark was in response to questions about whether Lucas falling on the floor could cause the injury to the brain that Salamat described. Salamat testified that Lucas's brain injuries could

---

[8] Gross also asserts that his "statements describing Amy striking [Lucas's] head and seeing him fall (and/or [Lucas's] fall on the deck from the preceding day) could explain [Lucas's] scalp bruising, which is separate and unrelated to the brain bleeding, swelling and hypoxia observed at autopsy." Gross does not explain what he means to convey by this assertion or how it advances his arguments. We will not consider this undeveloped argument. *See **Herder Hallmark***, 275 Wis. 2d 349, ¶16.

not have been caused by a simple fall to the floor but could be caused by a hand or fist:

> Q      Could this injury, original injuries been caused by somebody striking the child in the head with their fist or hand?
>
> A      Yes, a strong fist, hand.
>
> Q      If the child was struck in the head with a fist or hand, the child's head struck the floor, would that be consistent also?
>
> A      Falling on to the floor as a child usually wouldn't cause death.
>
> Q      I am not talking—
>
> A      Hitting, yes.
>
> Q      Struck with enough force to knock the child's head to the floor?
>
> A      Yes, it is the knocking of the head which caused that injury.
>
> Q      Initial blow?
>
> A      Yes.
>
> Q      The force with which it struck the floor isn't as important in that scenario?
>
> A      I don't suspect it is important, just falling down at that point, you know, if this child was to fall down on the floor, that [would] require him to fall down from may[be] 3 stories.
>
> Q      So, the initial blow would be the damaging part?
>
> A      Yes.

Huntington testified similarly, stating that "a real haymaker hit or punch" could cause the injuries to Lucas's brain that Huntington described. He further stated that the force required to cause the injuries to Lucas's brain would only be

17

consistent with a push or falling if the child was shoved down a flight of stairs or out of a second-story window. Because Salamat's and Huntington's testimony is consistent with Gross's testimony that he saw Amy strike Lucas in the head, Nichols's conclusion that Lucas sustained no mechanical injury to his head does not advance Gross's defense that Amy was the sole perpetrator. In fact, as previously stated, because Gross's defense included an allegation that Amy inflicted the injuries to Lucas's brain, Nichols's conclusion could actually serve to undermine his defense.

¶41    Thus, Nichols's conclusion that there was no evidence of a mechanical injury to Lucas's brain is irrelevant and does not create a reasonable probability of a different result. *See Plude*, 310 Wis. 2d 28, ¶32; *Avery*, 345 Wis. 2d 407, ¶25.

¶42    The fourth and final alleged dispute concerns evidence of whether some of Lucas's brain injuries occurred as a result of Shaken Baby Syndrome (SBS). While the SBS concept is complex, when we refer to SBS we mean the theory that, merely by vigorously shaking the body of an infant or young child, a person can cause SBS, resulting in serious, possibly fatal, brain injury. Nichols's report calls into question the scientific validity of SBS as a diagnosis and cause of infant deaths.[9]  Gross argues that SBS was significant to the State's case insofar as it supported Rowland's testimony that Gross had made a jailhouse confession of shaking Lucas. Therefore, Gross argues, Nichols's report undermining the scientific validity of SBS would have bolstered Gross's defense. The State

_____

[9] Nichols's position on SBS is unclear, however, because on the one hand he calls it "a theory which has never been proven by scientific means," but on the other he states that he has seen two "cases in which [he] concluded death due to SBS."

18

counters that Nichols's report challenging the theory behind SBS is immaterial because there was no evidence presented at trial that Lucas's brain injuries were caused by SBS, but only limited testimony possibly suggesting that shaking could have contributed to Lucas's brain injuries.

¶43 We agree with the State. The record does not support the conclusion that the prosecution presented this case to the jury as an SBS case. Neither Salamat nor Huntington testified that Lucas's injuries were caused by SBS, and both explicitly acknowledged their views that the science behind claims of SBS was uncertain at the time of trial. Salamat, who conducted the autopsy of Lucas's brain, would not agree that shaking was the cause of the brain injuries. When asked if "substantial shaking" could have been the cause, he responded: "You know, once upon a time people in my profession tried to separate shaking from impact injury, it is not proven …. [T]he hematoma I am shown, most of what I see is direct head trauma, I can not rule it out, say there was no shaking, but most of this is direct head trauma ...." Huntington likewise attributed the injuries to blows to Lucas's head and acknowledged the "serious debate in [his] profession" about whether a person can "merely shake a kid hard enough" to produce "serious brain damage." For his part, Corden refused to comment regarding injuries to Lucas's brain other than that resulting from his lacerated liver.

¶44 As the State correctly notes, the only specific testimony that Gross shook Lucas came from Rowland. But notably, Gross allegedly shaking Lucas was not the focus of Rowland's testimony, which in pertinent part stated that Gross had recounted how Amy had kicked Lucas, and "[Gross] punched him, and then [Gross] picked [Lucas] up and shook him, told him, be a man, stop crying." Further, Rowland did not testify that Gross had told him that the shaking had any

particular effect on Lucas, such as that Lucas went limp after the shaking or that he had any other reaction.

¶45     Gross relies heavily on the prosecutor's closing arguments in support of his SBS contentions.  But, as with the prosecutor's closing argument regarding testimony about the timing of injuries discussed above, we presume that the jury followed the instruction from the circuit court that arguments by counsel are not evidence and that the jury should disregard remarks not supported by the evidence.  In closing the prosecutor argued:  "[Rowland] provided what happened, he says, Gross told them that [Lucas] wouldn't quit crying, and what did [Gross] do, I shook him, when he shook him that is when we have the second injury that is confirmed by Dr. Salamat too."  However, as now noted by the State, in his response closing, Gross emphasized that the doctors called by the State refuted that Lucas's injury was the result of SBS.  In fact, Gross asked what "bearing" Rowland's testimony had on the case, given Salamat's testimony that it was unlikely that Lucas was a victim of SBS.  In rebuttal, the prosecutor made a somewhat ambiguous statement, namely, that Salamat in his testimony was "not ruling out simply a shake" and that "usually the shaking and the impact goes in conjunction."  To the extent that the prosecutor argued that the jury could convict Gross based on an SBS theory of brain injury, it would have been clear to a jury that this was contrary to the evidence and should be ignored.

¶46     In sum, the new SBS evidence is not material, nor is it reasonably likely to produce a different result.[10]

---

[10] We are therefore not persuaded by Gross's reliance on **State v. Edmunds**, 2008 WI App 33, 308 Wis. 2d 374, 746 N.W.2d 590, and **State v. Hicks**, 202 Wis. 2d 150, 549 N.W.2d 435 (1996).  Unlike this case, **Edmunds** was unequivocally an SBS case.  And unlike here, in

(continued)

¶47 Finally, apart from the specific arguments Gross raises, the State correctly argues that Nichols's report does not establish a reasonable probability of a different outcome because of the overwhelming evidence against Gross. For example, we note that, even with Nichols's report, the jury would still have heard the evidence summarized at length above: that Lucas told multiple people that Gross was abusing him; that Lucas was consistently afraid of Gross; that Gross had a history of abusing the young sons of his former girlfriends, demonstrating intent and absence of mistake or accident; that Gross changed his story to law enforcement about what had happened to Lucas; and that Gross had told two inmates that he punched, struck, and kicked Lucas. In the final analysis, Gross's newly discovered evidence claim fails, not only on grounds of immateriality and cumulativeness discussed above, but primarily because there is not a "reasonable probability that a jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt" about his guilt. *See Plude*, 310 Wis. 2d 28, ¶33 (quoted source and internal quotation marks omitted). Therefore, considering all of these facts, and the general insufficiency of Gross's arguments, we conclude that the circuit court did not err in declining Gross's request to hold an evidentiary hearing because, even if true, the allegations contained in Gross's motion would not entitle him to relief. *See Allen*, 274 Wis. 2d 568, ¶¶9, 12.

### III. Ineffective Assistance of Counsel

¶48 Gross argues in the alternative that, if this court concludes that the evidence is not newly discovered, then his counsel was ineffective for failing to

---

*Hicks*, the hair comparison evidence that was later called into question was "pivotal" to the State's theories of prosecution at trial. *See Hicks*, 202 Wis. 2d at 171.

present it. However, because we assume for purposes of this appeal that the evidence was newly discovered, and because Gross's ineffective assistance claims are predicated on Gross's same arguments rejected above, we need not address Gross's alternative argument that trial counsel was ineffective.

### IV. New Trial in the Interests of Justice

¶49    Gross's final argument for a new trial is that this court should invoke its discretionary authority to order a new trial in the interests of justice. We decline to do so.

¶50    This court has discretionary authority to reverse judgments and order a new trial if it appears that "the real controversy has not been fully tried" or if "it is probable that justice has for any reason miscarried." WIS. STAT. § 752.35. However, we exercise this power sparingly, and only in "'*exceptional* cases.'" *State v. McKellips*, 2016 WI 51, ¶30, 369 Wis. 2d 437, 881 N.W.2d 258 (quoted source omitted).

¶51    Gross argues that we should invoke our discretionary power to reverse because the real controversy was not fully tried. In support of this contention, Gross relies on the same arguments that he made in his newly discovered evidence and ineffective assistance of counsel claims. We reject Gross's argument because we earlier concluded that each of Gross's other grounds for an evidentiary hearing or a new trial was without merit. As we have noted in other reversal in the interests of justice cases: "'Zero plus zero equals zero.'" *See, e.g.*, *State v. Lock*, 2012 WI App 99, ¶124, 344 Wis. 2d 166, 823 N.W.2d 378 (quoting *Mentek v. State*, 71 Wis. 2d 799, 809, 238 N.W.2d 752 (1976)).

## V. Restitution Order

¶52    When Gross was sentenced in September 2002, the circuit court ordered the State to file restitution information within 30 days, after which point Gross would have 30 days to respond. Nothing in the record definitively indicates whether the State filed restitution information within the original 30-day period. However, approximately one year later, on September 30, 2003, a victim witness coordinator for Juneau County sent a letter and a proposed restitution order to the circuit court and Gross's trial counsel, requesting that the court enter the restitution order if the court did not receive an objection from Gross's trial counsel within 10 days. Three weeks later, on October 20, 2003, the circuit court ordered Gross to pay $3,712 in restitution for Lucas's funeral expenses.

¶53    In his motion requesting that the court vacate the restitution order, Gross alleged that he did not receive notice of the restitution proposal or order until November 2016, when his inmate trust account statement showed a debt for restitution. The court denied Gross's motion without a hearing.

¶54    Gross appeals the court's decision, arguing that the restitution order entered over 13 months after sentencing was untimely under WIS. STAT. § 973.20(13)(c) and was entered without the requisite notice. Gross argues that his motion is properly brought pursuant to WIS. STAT. § 974.06 or under the circuit court's inherent authority to modify a sentence based on a "new factor." For the reasons that follow, we uphold the circuit court's decision denying Gross's motion to vacate the restitution order.

## A. WIS. STAT. § 974.06 Motion

¶55    Gross argues that the circuit court should have vacated the restitution order based on his WIS. STAT. § 974.06 motion. The State argues that he cannot raise this issue in a § 974.06 motion because the scope of such a motion "is limited to matters of constitutional or jurisdictional dimension." *See **State v. Carter***, 131 Wis. 2d 69, 81, 389 N.W.2d 1 (1986). We agree with the State.

¶56    Gross does not challenge the restitution order on jurisdictional or constitutional grounds. His WIS. STAT. § 974.06 restitution motion relies on two allegations:  the circuit court failed to comply with the timing provisions of WIS. STAT. § 973.20(13)(c) and the court entered the restitution order without providing Gross notice or the opportunity to challenge the order.

¶57    With respect to the alleged statutory violation, the State correctly notes that errors related to a statutory provision are not generally of a constitutional dimension. *See **Carter***, 131 Wis. 2d at 81-82 (failure to follow statutory procedures for taking a plea was not a constitutional violation, and, because "an alleged statutory violation is beyond the scope of a [WIS. STAT. §] 974.06 motion," Carter was precluded from raising the statutory challenge in his § 974.06 motion).

¶58    Here, while Gross argues at length that the restitution order violated the timing provisions of WIS. STAT. § 973.20(13)(c), he makes no argument that the alleged statutory violation is a matter of jurisdictional or constitutional dimension. Therefore, Gross's statutory challenge is not the proper subject of a WIS. STAT. § 974.06 motion.

¶59 As for the alleged lack of notice, Gross fails to make any due process argument in his brief-in-chief on appeal. In his reply, Gross merely states: "Notice and opportunity to be heard are the hallmarks of due process." Gross does not support this conclusory assertion with citation to legal authority or apply due process standards to the facts at issue. Nor does he explain why providing notice of the restitution request to his trial counsel was insufficient notice, beyond his cursory statement that trial counsel "was no longer representing Gross at the time because the case was on appeal." Thus, to the extent Gross means to raise a due process argument, we reject it as inadequately developed. *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("Arguments unsupported by legal authority will not be considered, and we will not abandon our neutrality to develop arguments." (citations omitted)).

¶60 Rather than developing a constitutional or jurisdictional argument in support of his WIS. STAT. § 974.06 motion, in his reply brief Gross argues that, under *State v. Minniecheske*, 223 Wis. 2d 493, 590 N.W.2d 17 (Ct. App. 1998), he may challenge the restitution order through a § 974.06 motion. We reject this argument.

¶61 The "sole issue" in *Minniecheske* was the power of a sentencing court to order the State to refund to the defendant restitution that had been improperly collected from the defendant. *Minniecheske*, 223 Wis. 2d at 496. We held that the circuit court lacked competency to order such a refund, stating that, while WIS. STAT. § 974.06 "may be a proper vehicle to remove the restitution order from the judgment of conviction, it does not authorize the trial court to award a money judgment against the State." *Minniecheske*, 223 Wis. 2d at 499. Gross appears to read this language to mean that all motions seeking to vacate

restitution orders necessarily have jurisdictional or constitutional dimensions or else that no such jurisdictional or constitutional dimension is required under § 974.06.

¶62    Both of Gross's proposed interpretations misread *Minniecheske*. Far from dispensing with a jurisdictional or constitutional requirement, *Minniecheske* reinforces this requirement, stating that a WIS. STAT. § 974.06 postconviction motion "permits defendants to challenge judgments of conviction *when jurisdictional issues are raised or constitutional rights have been violated*." *Minniecheske*, 223 Wis. 2d at 498 (emphasis added). Moreover, *Minniecheske* merely notes that a § 974.06 motion "may" be a proper procedural vehicle for vacating a restitution order. *See Minniecheske*, 223 Wis. 2d at 499. *Minniecheske* does not state—nor does it analytically follow—that *any* ground raised for vacating a restitution order under a § 974.06 motion is a matter of jurisdictional or constitutional dimension merely because it is contained in such a motion. In *Minniecheske*, the parties agreed that the State "lacked authority" to collect restitution after Minniecheske's imprisonment because, under the law at that time, "a sentencing court could not require a defendant sentenced to prison to pay restitution for the crime." *Minniecheske*, 223 Wis. 2d at 496. We interpret *Minniecheske* as implicitly concluding that Minniecheske's § 974.06 motion to vacate the restitution order raised an issue of jurisdictional or constitutional dimension.

¶63    Because Gross has failed to develop a jurisdictional or constitutional challenge, he may not use a WIS. STAT. § 974.06 motion to seek relief from the circuit court's restitution order.

### B. *"New Factor" Sentence Modification*

¶64    As previously stated, Gross asserts that the restitution order should be vacated under the court's inherent authority to modify a sentence based on a new factor. Circuit courts have inherent authority to modify a sentence at any time based on a "new factor." *See State v. Noll*, 2002 WI App 273, ¶¶5, 11-12, 258 Wis. 2d 573, 653 N.W.2d 895. A new factor is "'a fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing, either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties.'" *State v. Harbor*, 2011 WI 28, ¶¶40, 52, 333 Wis. 2d 53, 797 N.W.2d 828 (quoting and reaffirming definition of "new factor" in *Rosado v. State*, 70 Wis. 2d 280, 288, 234 N.W.2d 69 (1975)).

¶65    Whether sentence modification based on a new factor is appropriate is subject to a two-step inquiry. *Id.*, ¶36. Under the first step, the defendant must offer clear and convincing evidence of a new factor. *Id.* Whether the defendant has met this burden is a question law. *Id.* If the defendant meets this burden, then the circuit court "determines whether that new factor justifies modification of the sentence." *Id.*, ¶37. In making this determination, the circuit court exercises its discretion. *Id.*

¶66    In order to receive sentence modification, a defendant must prevail under both steps. *Id.*, ¶38. "Accordingly, if a court determines that the facts do not constitute a new factor as a matter of law, 'it need go no further in its analysis' to decide the defendant's motion." *Id.* (quoting *State v. Crochiere*, 2004 WI 78, ¶24, 273 Wis. 2d 57, 681 N.W.2d 524).

¶67    In his brief-in-chief, Gross asserts: "Lack of notice constitutes a new factor justifying sentence modification." He does not apply the new factor standards to this conclusion nor cite authority for it. Also, as previously stated, Gross does not explain why it was insufficient to notify his trial counsel of the restitution request. Instead, in his reply brief, Gross again relies on *Minniecheske*, in which this court determined that a sentence modification motion alleging a new factor is "a proper vehicle to secure the removal of an invalid restitution order from a judgment of conviction." *Minniecheske*, 223 Wis. 2d at 499. However, although such a motion may be a "proper vehicle," the movant is nonetheless required to develop an argument sufficient to show, by clear and convincing evidence, that he or she meets the standards for a new factor. Gross has failed to develop such an argument, and we reject it on that basis. *See State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) ("[T]he Court of Appeals of Wisconsin is a fast-paced, high-volume court…. We cannot serve as both advocate and judge.").

¶68    Further, even if we were to reach the merits, Gross has not shown by clear and convincing evidence that "lack of notice" is "highly relevant" to the imposition of the court's restitution order, as required under the new factor test. *See Rosado*, 70 Wis. 2d at 288. Instead, Gross's argument appears to be that, had he been given notice, he would have advanced a successful argument against the restitution requested. It is not clear whether the argument he would raise would be the statutory timing argument he argues on appeal, that he was "indigent and incarcerated," which he also asserts, or some other argument. Regardless, we conclude that Gross's "lack of notice" argument is too attenuated from the "highly relevant to the imposition of sentence" requirement to constitute a new factor. *See id.*

28

¶69 In sum, Gross has failed to show that the court erred in denying his motion to vacate the restitution order.

## CONCLUSION

¶70 For the reasons stated above, we affirm the circuit court's decision.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.